**UNITED STATES of America, Plaintiff–Appellee,**

v.

**JUVENILE, Defendant–Appellant.**

No. 02–30253.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 3, 2003.

Filed Oct. 23, 2003.

David F. Ness, Assistant Federal Defender, Great Fall, MT, for the defendant-appellant.

Marcia Hurd (argued), Marcia Good Sept, Assistant United States Attorneys, Billings, MT, for the plaintiff-appellee.

Before DONALD P. LAY,* WARREN J. FERGUSON, and RONALD M. GOULD, Circuit Judges.

Opinion by Judge FERGUSON; Concurrence by Judge LAY; Partial Concurrence and Partial Dissent by Judge GOULD.

FERGUSON, Circuit Judge:

C.K., a juvenile, appeals the sentence imposed by the District Court as a result of his guilty plea delinquency adjudication, under which C.K. will remain confined until his twenty-first birthday. The District Court had jurisdiction under the Federal Juvenile Delinquency Act (FJDA), 18 U.S.C. § 5031 *et seq.*, and we have jurisdiction over his appeal pursuant to 28 U.S.C. § 1291. We hold that the sentence imposed was both arbitrary and in direct contravention of the rehabilitative purposes of the FJDA and therefore an abuse of discretion.

## I. Background and Procedural History

### A. Factual Background

C.K. is a fourteen-year old member of the Cheyenne River Sioux Tribe. He was born in Montana and spent the first six years of his life on the Fort Belknap Indian reservation with his parents and other family members. A precocious young person, C.K. attended Head Start and could read and count to 100 by the time he was three.

In 1994, when C.K. was around six, his parents separated. C.K. and his younger brother and sister officially remained in the custody of their mother, who moved to South Dakota. Although they lived with their mother, the three siblings returned to stay with their father and paternal grandmother in the Fort Belknap Indian community on a regular basis over the next two years. C.K. attended first grade in South Dakota, where he received excellent or outstanding grades.

Around the time of his parents' separation, C.K. was referred to the Fort Belknap Health Center ("FBHC") by the Fort Belknap Tribal Court. C.K.'s parents had ongoing conflicts and both of them alleged that C.K. had been abused by the other. C.K.'s paternal grandmother also reported to FBHC workers that C.K. was "mean" when he returned from his mother's residence in South Dakota. FBHC's own report indicated that C.K. appeared to be

---

* Honorable Donald P. Lay, Senior United States Circuit Judge for the Eighth Circuit, sitting by designation.

"nervous." Concerned, the FBHC clinician requested that C.K. be interviewed alone. However, C.K. denied that anyone had ever touched him sexually. Other than the initial interview, C.K. was not referred for further evaluation or counseling.

Tragically, C.K. was in fact being severely sexually abused by multiple offenders during the period both before and after this interview. When C.K. was between four and five years old, an older boy for whom C.K.'s mother was babysitting abused C.K. repeatedly, sodomizing him approximately thirty to forty times and forcing him to perform oral sex approximately twenty times over a one-year period. Fearful of retaliation and only barely old enough to comprehend what was happening to him, C.K. did not report the abuse to his parents or anyone else.

Unfortunately, C.K.'s victimization did not stop with this traumatic experience. A couple of years later, while staying with his mother in South Dakota, C.K. was again abused, this time by an older cousin. Over a period of many months, this cousin sodomized C.K. on at least forty or fifty occasions and forced him to engage in oral sex. He also exposed C.K. to pornographic material and, on at least one occasion, tied him up while he abused him. Although C.K.'s little sister complained to their mother about their cousin's behavior, apparently their mother did not seek treatment or counseling for either of the children, nor did she inform their father about what had occurred. No punishment was ever imposed on either of the individuals who victimized C.K., nor did he receive counseling or other support services as a result of these incidents.

When C.K. returned from South Dakota, his father noticed a marked change in his personality, including more physical inhibitions. As C.K.'s father explained at the sentencing hearing,

> I remember vividly when [C.K.] would come home [to Montana], and I would always call him Tweety Bird, because he had great big eyes. And he used to always tell me about his encounters. And I remember he used to come home, crawl over my shoulders like a little snake up and down my legs and jump on my lap ... And one summer he came home and he never did that. And he stayed away ... He was distant.... I thought that was because he was reaching adolescence at any early age ... because ... he talked about[ ] the birds and bees, because he had some questions about why hair was growing in certain places, if it was all right to grow there and stuff. But the day he stopped crawling all over me and telling me about his fun he had in South Dakota, makes sense now, because that's when he was victimized.[1]

In 1996, C.K.'s father obtained physical custody over all three siblings through the Tribal Court.

As noted above, C.K. was an exceptional student and, for many years, did not have problems in school. His instructors at the Catholic school in Montana where he attended fifth and sixth grade reported that he was well-liked by teachers and other students, although he was somewhat quiet. As he entered middle school, however, C.K. began to have repeated attention and

---

1. Age-inappropriate sexual knowledge is a common symptom among sexually abused children, along with other sexualized behaviors, anxiety, depression, withdrawn behavior, somatic complaints, aggression, and school problems. *See* Kathleen A. Kendall–Tackett, Linda Meyer Williams, & David Finkelhor. *Impact of Sexual Abuse on Children: A Review and Synthesis of Recent Empirical Studies.* 113 PSYCHOLOGICAL BULLETIN 1, 165 (1993).

discipline problems. C.K. later reported that he experienced recurring nightmares, insomnia, anger, intrusive thoughts, and depression during this time, all of which are associated with Post–Traumatic Stress Disorder (PTSD), a frequent symptom of sexual abuse among children. *See* Kendall–Tackett et al., at 175.

In December 2000, when he was twelve, C.K. attempted suicide by intentionally ingesting a muscle relaxant. After his stomach was pumped, he reported to hospital officials that he was depressed because of his younger half-brother's ongoing treatment for leukemia. He was released the following day and, again, no one referred C.K. for further evaluation or counseling.

Several months later, on April 26, 2001, C.K.'s school psychologist contacted Fort Belknap Social Services to report allegations that C.K. had sexually abused two children. The Federal Bureau of Investigations ("FBI") subsequently took over the investigation. During the course of the investigation, it was revealed that C.K. had initiated sexual contact with a slightly younger girl by touching her vaginal area on one occasion. One of C.K.'s cousins also alleged that C.K. had placed his hand on his penis and buttocks while they were sitting on a couch, and that C.K. had sodomized him and forced him to engage in oral sex several years earlier (when C.K. was approximately eight or nine years old).[2]

Almost immediately upon hearing of the allegations about his son, C.K.'s father requested that C.K. be evaluated by clinicians at FBHC. FBHC workers noted that C.K. "occasionally appeared disengaged from conversation[,] described himself as having an ability to distract himself from bad things" and was possibly subject to PTSD. C.K. also expressed to FBHC workers that he was "shocked and numb" as a result of the allegations, and denied that the alleged conduct had taken place.

A few weeks after his initial evaluation by FBHC, C.K. was examined by a doctor in Billings, Montana, who conducted a "psychosexual evaluation."[3] During this three and a half hour interview, C.K. reported his own history of abuse for the first time and admitted the sexual conduct that underlies the instant offenses. The evaluating physician diagnosed C.K. with a wide-range of possible problems and categorized C.K. as a "moderate risk juvenile sex offender." He also expressed concern that C.K.'s living situation at the time— C.K. was living at home and was not yet receiving any counseling or medication— was inappropriate. He expressed his belief that placement at a residential treatment center would offer C.K. the appropriate level of support and structure. He indicated that, at a minimum, any placement should meet "minimal standards of care" and that C.K. should not be placed in an environment with young or vulnerable children.

After C.K.'s evaluation, FHBC prescribed him two different anti-depressants and referred him and his family to a counselor, Connie Dilts. C.K. initially had difficulty admitting his conduct to Dilts and, according to Dilts, was "very shut down emotionally during many sessions, a coping skill he developed to avoid dealing with his

---

**2.** Other allegations made during the course of the investigation, which appear in the Pre-Sentence Report, were explicitly not considered by the District Court due to objections by defense counsel. Because they allegedly did not underlie the District Court's sentencing decision, we do not include them here.

**3.** Neither the evaluation nor the physician's credentials or expertise are part of the record on appeal.

own abuse." C.K. was, however, "very aware of how much pain he was experiencing and the need to address his sexual issues," and expressed his desire to have someone help him to deal with his problems.

In mid-March 2002, shortly before the initial charges were filed against him, C.K. was placed at Normative Services residential treatment facility ("Normative"). While the first two months of his stay there, particularly the first month, were marked by an overall "poor performance," starting in June, C.K. was "more open" and "participating in group and individual treatment without resistance." Thus, at the time of sentencing, C.K. had been successfully performing at Normative for nearly half of his time there. Normative officials estimated that with another year of treatment, depending on C.K. and his family's continued participation and cooperation, C.K. would be ready to be released to his family. At the time of sentencing, Normative personnel recommended that C.K. be continued in their program.

## B. Underlying Proceedings and Procedural History

On March 25, 2002, the United States Attorney filed an Information charging C.K. with two counts of aggravated sexual abuse of a child, as defined in 18 U.S.C. § 2241(c), both occurring during the year 2000 and continuing into 2001, while C.K. was between the ages of twelve and thirteen. On April 17, 2002, C.K. appeared for Arraignment and entered a plea of Not True to the Information.

On June 11, 2002, pursuant to a Plea Agreement, C.K. pleaded guilty to the second count of the Information. The Plea Agreement contained the government's recommendation that C.K. be committed to the custody of the Attorney General until his eighteenth birthday, and that he be required to successfully complete sexual offender treatment. On July 3, 2002, the Probation Office submitted its Pre–Sentence Report ("PSR").

On July 24, 2002, the District Court conducted a Sentencing Hearing, at which it embraced the factual findings of the PSR, with a few exceptions. The Court also heard from C.K.'s father, who expressed regret at his failure to identify C.K.'s needs earlier, and C.K., who apologized for his actions as well as his early "acting out" at Normative. The District Court then sentenced C.K. to the custody of the Attorney General until his twenty-first birthday, the maximum sentence that a court can impose under the FJDA. The District Court summarized the reasons for its sentence as follows:

> [T]here are a number of reasons for the sentence that I am going to impose. And they include the seriousness of the offense . . ., the fact that there are other offenses in your past and in your history that are of the same type beyond the charge that was admitted, the fact that you have been given the opportunity to attempt to make progress with treatment; and that you have done very little to take advantage of that. But that you have a real and even profound need for continued treatment that will succeed only if you cooperate with it and only if you are placed in an environment where that treatment will be seen by you as a positive opportunity . . . And I have determined that that can only be accomplished if you are assured of being in a structured environment that will not permit you the choice of seeking to return to your prior activities.

The District Court also issued a strong recommendation that C.K. be placed in a Bureau of Prisons facility in South Dakota,

approximately 800 miles from C.K.'s home and tribe.

On August 1, 2002, C.K. filed this timely appeal.

## II. DISCUSSION

### A. Standard of Review

■ Both parties assert that the applicable standard of review for a juvenile delinquency sentence that falls within the Guidelines is abuse of discretion. However, neither *United States v. G.L.* nor *United States v. Juvenile (LWQ)*, which the parties refer to as stating the applicable standard, explicitly considered this question. *See United States v. G.L.*, 143 F.3d 1249, 1252 (9th Cir.1998) (applying abuse of discretion standard to review of a district court's decision to depart from the Sentencing Guidelines range); *United States v. Juvenile (LWQ)*, 38 F.3d 470, 472 (9th Cir.1994) (applying abuse of discretion standard to review of probation sentences imposed under the 1984 Sentencing Reform Act). Thus, the question of the appropriate standard of review for a juvenile delinquency sentence that falls below the maximum is apparently a new question for this Circuit.

■ As discussed below, the Sentencing Reform Act of 1984 and the accompanying implementation of the Sentencing Guidelines left little impact on the FJDA, including the discretion it vests in district courts to fashion a sentence that serves the rehabilitative goals of that Act. "If an 'essentially factual' inquiry is present, or if the exercise of the district court's discretion is determinative, then we give deference to the decision of the district court." *United States v. Owens*, 789 F.2d 750, 752 (9th

Cir.1986), *rev'd on other grounds*, 484 U.S. 554, 108 S.Ct. 838, 98 L.Ed.2d 951 (1988). Accordingly, we hold that the appropriate standard of review is abuse of discretion. *Accord United States v. Alexander*, 695 F.2d 398, 400 (9th Cir.1982) (reviewing for abuse of discretion transfer decision under § 5032).

### B. Sentencing Under the FJDA

■ Under the FJDA, a district court has several sentencing options: "the court may suspend the findings of juvenile delinquency, enter an order of restitution [ ], place him on probation, or commit him to official detention." 18 U.S.C. § 5037 (2001).[4] The maximum term of "official detention" to which a juvenile may be sentenced is the lesser of the period until the juvenile turns twenty-one years old or the maximum that could be imposed under the United States Sentencing Guidelines. 18 U.S.C. § 5037(c). Although the Guidelines and the juvenile's age set the upper limit for sentencing, the Guidelines are explicitly not applicable to other sentencing determinations for juveniles. U.S.S.G. § 1B1.12; *see also United States v. R.L.C.*, 503 U.S. 291, 306–07, 112 S.Ct. 1329, 117 L.Ed.2d 559 (1992) ("although determining [the maximum sentence ] . . . will [ ] require sentencing and reviewing courts to determine an appropriate Guideline range . . ., we emphasize that it does not require plenary application of the Guidelines to juvenile delinquents."); *United States v. A.J.*, 190 F.3d 873, 875 (8th Cir.1999) (§ 5037 "does not require 'plenary application of the Guidelines to juvenile delinquents'.") (quoting *R.L.C.*, 503 U.S. at 307, 112 S.Ct. 1329).

---

4. Under the 2002 Amendments to the FJDA, a district court may also "include a term of juvenile delinquent supervision to follow detention." Because the amendments did not go into effect until November 2, 2002, they do not apply to C.K.'s case. *See* Consequences for Juvenile Offenders Act of 2002, Pub.L. No. 107–273, 116 Stat 1758, 1896–97.

Although the FJDA does not set out specific guidelines for crafting a juvenile sentence below the maximum, the scope of a district court's sentencing discretion is limited by the purposes of the FJDA, which authorizes federal courts to sentence particular juveniles in the first place. "The purpose of the [FJDA is] to enhance the juvenile system by removing juveniles from the ordinary criminal justice system and by providing a separate system of 'treatment' for them." *United States v. Frasquillo–Zomosa*, 626 F.2d 99, 101 (9th Cir.1980); *see also United States v. One Juvenile Male*, 40 F.3d 841 (6th Cir.1994); S. REP. NO. 93–1011, at 5312 (1974) (describing 1974 amendments to FJDA as "incorporat[ing] the rehabilitative concept of a juvenile proceeding"). "A successful prosecution under the Act results in a civil adjudication of status, not a criminal conviction." *United States v. Doe*, 53 F.3d 1081, 1083 (9th Cir.1995). Although "[t]he rehabilitative philosophy which underpins the FJDA is ... tempered by a realistic outcome-oriented analysis when the presumption of juvenile status is challenged in the transfer hearing process," *United States v. E.K.*, 471 F.Supp. 924, 932 (D.Or.1979), so long as a juvenile remains within the auspices of the FJDA for sentencing, he or she is presumptively capable of rehabilitation, and any sentence imposed by a district court must accord with this presumption. *See id.* ("Where realistic chances for rehabilitation exists, the balance ought not to tip in recognition of the general societal interests subsumed in the broader sense of the word 'justice.' ").

In keeping with its rehabilitative goals, the FJDA disfavors institutionalization and in particular the warehousing of young people away from their communities. *See* 18 U.S.C. § 5039 ("Whenever possible, the Attorney General shall commit a juvenile to a foster home or community based-facility located in or near his home community."); *accord,* Robert E. Shepherd, ed. ABA JUVENILE JUSTICE STANDARDS, ANNOTATED (hereinafter "ABA STANDARDS"): INTRODUCTION XIX (1996) (Discussing basic principles of standards, including principle that "[t]he least restrictive alternative to accomplish the purpose of the intervention should be the choice of decision makers at every stage, with written reasons for finding less drastic remedies inadequate."); *and* ABA STANDARDS: STANDARDS RELATING TO DISPOSITIONS § 3.3(B) ("There should be a presumption against coercively removing a juvenile from his or her home, and this category of sanction should be reserved for the most serious or repetitive offenses."). Youth who are adjudged to be delinquent under the FJDA must therefore be confined in the least-restrictive environment that will support their continued rehabilitation. *See* S. REP. NO. 93–1011, at 5320 (explaining amendments to § 5039 [formerly § 5035] as indicating that juvenile "detention must be in as non-restrictive an environment as possible"), *see also id.* at 5285 ("the highest attention must be given to ... minimizing the involvement of young offenders in the juvenile and criminal justice system and to reintegrating delinquents and young offenders into the community."). Although a "disposition in the juvenile court ... may authorize confinement until age 21, [ ] it will last no longer and within that period will last only so long as [the juvenile's] behavior demonstrates that he remains an unacceptable risk if returned to his family." *McKeiver v. Pennsylvania*, 403 U.S. 528, 552, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971) (White, J., concurring). While a least-restrictive standard for confinement may not be constitutionally required, *see Reno v. Flores*, 507 U.S. 292, 303–05, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993), we conclude that such a require-

ment is implicit in the structure and purposes of the FJDA sentencing provisions.[5]

The government asserts that amendments to the FJDA by the Sentencing Reform Act of 1984 fundamentally shifted the goal of the FJDA from rehabilitation to punishment, deterrence, and incapacitation. We find this assertion unpersuasive. The Supreme Court has specifically rejected the argument that the 1984 amendments fundamentally altered the rehabilitative purposes of the FJDA. *See R.L.C.*, 503 U.S. at 299 n. 2, 112 S.Ct. 1329. As the Supreme Court has made clear, Congress specifically considered and rejected incorporation of adult sentencing provisions into § 5037. *See id.* at 299–305, 112 S.Ct. 1329. More importantly, the 1984 amendments did not alter the basic sentencing structure of the Act, nor did they remove or transform the rehabilitative language surrounding commitment proceedings. *See* Sentencing Reform Act of 1984, Pub.L. No. 98–473, § 214, 98 Stat. 1837, 2014 (1984).[6]

■ Moreover, if the primary goal of the federal juvenile justice system is no longer rehabilitation, as the government asserts, then the lessened due process protections afforded under the system would become extremely problematic. Courts have repeatedly justified the informality and lesser procedural protections afforded in the juvenile system on the basis of its unique, rehabilitative nature. *See Schall v. Martin*, 467 U.S. at 268, 104 S.Ct. 2403

---

**5.** The "least-restrictive" environment requirement is also consistent with national standards for juvenile sentencing jointly promulgated by the Institute of Judicial Administration ("IJA") and the American Bar Association ("ABA"). *See* ABA STANDARDS: STANDARDS RELATING TO DISPOSITIONS § 2.1. ("In choosing among statutorily permissible dispositions, the court should employ the least restrictive category and duration of disposition that is appropriate to the seriousness of the offense, as modified by the degree of culpability indicated by the circumstances of the particular case, and by the age and prior record of the juvenile.").

The least-restrictive environment requirement is also consistent with state practice. At least twenty states explicitly provide for some sort of "least restrictive" disposition for delinquents consistent with rehabilitation and other state goals. *See* ALA.CODE § 12–15–1.1 (2003); ALASKA STAT. § 47.12.140(2) (Michie 2003); ARIZ. REV. STAT. ANN. § 8–341.01 (2003); ARK. CODE ANN. § 9.27.329(d) (Michie 2003); CA.RULES OF COURT § 1493(e)(3)(b); DEL. CODE ANN. tit. 29 § 9001 (2003); FL. STAT. ANN. § 985.03 (West 2003); HAW. REV. STAT. ANN. § 352D–2(2) (Michie 2002); IND. CODE ANN. § 31.37.18.6(4) (West 2003); IOWA CODE ANN. § 232.52 (West 2003) (as amended); KY. REV. STAT. ANN. § 635.515(2) (West 2002) (least restrictive environment required for treatment of juvenile sexual offenders); LA. REV. STAT.

ANN. tit. 14 § 110(B) (West 2002); ME. REV. STAT. ANN. tit. 15, § 3002 (West 2003) (*see* Commentary); MD. CODE ANN., Courts and Judicial Proceedings, § 3–8A–02 (2003) (providing for out-of-home disposition only when "necessary"); NEV. REV. STAT. ANN. 232.400(c) (Michie 2003); N.H. REV. STAT. ANN. § 169–B:19(2002); N.Y. FAM. CT. ACT § 352.2(2) (McKinney 2003); S.D. CODIFIED LAWS § 26–8C–7 (Michie 2003); TENN. CODE ANN. § 37–5–102 (2003); W. VA. CODE ANN. § 49–1–1 (Michie 2003). *See also In re S.M.*, 229 Ill. App.3d 764, 769, 171 Ill.Dec. 558, 594 N.E.2d 410 (1992) (commitment of a minor to the Department of Corrections should only be used when less severe alternatives would not be in the best interests of the minor and the public); *State in Interest of D.F.*, 138 N.J.Super. 383, 390, 351 A.2d 43 (1975) (juvenile delinquency statute implicitly requires juvenile court to select disposition most likely to achieve rehabilitative goals); *In re Roberts*, 13 Md.App. 644, 284 A.2d 621 (1971) (in making a disposition in delinquency proceedings, delinquent child should be retained in his home wherever possible).

**6.** The case that the government relies upon is inapposite. *United States v. Juvenile (LWQ)*, although it involved a juvenile, dealt solely with the imposition of probation conditions pursuant to 18 U.S.C. § 3553. *See* 38 F.3d at 472–73. The case did not in any way address the applicability of the 1984 Act to the FJDA.

(state's " 'interest in preserving and promoting the welfare of the child' makes a juvenile proceeding fundamentally different from an adult criminal trial") (quoting *Santosky v. Kramer*, 455 U.S. 745, 766, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)); *McKeiver*, 403 U.S. at 545–47, 91 S.Ct. 1976 (trial by jury for juveniles not constitutionally required); *United States v. Male Juvenile*, 280 F.3d 1008, 1021 (9th Cir. 2002) (rejecting right to jury trial for juveniles under FJDA). We have explicitly held that "the rehabilitative purpose of juvenile delinquency proceedings obviates the requirement of the formalities of the criminal adjudicative system." *United States v. Indian Boy X*, 565 F.2d 585, 595 (9th Cir.1977) (holding no formal indictment process required under FJDA). The government's suggested construction of the FJDA would require us to reevaluate the rationale underlying juvenile justice jurisprudence for the past forty years. We reject such a broad reinterpretation of the statute and hold that, absent a clear indication from Congress to the contrary, the primary purpose of the FJDA remains to rehabilitate children who have committed criminal acts, assisting them to become successful and productive members of their communities.

In short, although the FJDA grants district courts the discretion to select from among the dispositions authorized under § 5037, this discretion must be exercised in accordance with the rehabilitative function of the FJDA, which requires an assessment of the totality of the unique circumstances and rehabilitative needs of each juvenile. It must be clear from the record, if not explicit, that a district court weighed all of the relevant factors and found that the disposition imposed was the least restrictive means to accomplish a young person's rehabilitation, given the needs of the child and the community. With these principles in mind, we now turn to the disposition imposed upon C.K. by the District Court.

### C. District Court Sentence

█ As noted above, the District Court in this case imposed the maximum disposition available to it under § 5037, sentencing C.K. to confinement by the Bureau of Prisons until his twenty-first birthday, or nearly seven years. Only eighteen of the eighty-one months of C.K.'s sentence are to be served in a treatment program for juvenile sexual offenders.[7] The remaining five plus years of C.K.'s sentence, regardless of while in Bureau of Prisons custody. C.K.'s successful completion of treatment, are to be served in a general Bureau of Prisons juvenile detention facility with no provisions for targeted treatment. In short, over three-quarters of C.K.'s sentence was imposed for purely punitive or incapacitating purposes, neither of which constitute permissible sentencing factors under the FJDA.

We hold that the District Court in this case abused its discretion. As an initial matter, we note that a seven year sentence is grossly discrepant with the recommended term of confinement promulgated by the ABA and IJA for offenses such as the one committed by C.K.[8] *See* ABA STANDARDS: STANDARDS RELATING TO JUVE-

---

7. As of the time of this appeal, C.K. had still not received any treatment

8. Although the Standards are not binding on the District Court, we nevertheless find them both relevant and instructive in determining whether the District Court abused its discretion. *See, e.g., United States v. Leonti*, 326 F.3d 1111, 1121 (9th Cir.2003) (looking to ABA Standards for Criminal Justice in determining whether defense counsel's conduct constituted ineffective assistance); *see also United States v. Minore*, 292 F.3d 1109, 1115 (9th Cir.2002).

NILE DELINQUENCY AND SANCTIONS § 5.2. The Juvenile Justice Standards categorize offenses such as C.K.'s, for which the maximum sentence authorized would exceed five years if the crime was committed by an adult, as a "class two juvenile offense." *Id.* at § 4.2. For a class two offense, the Standards recommend that the court "not impose a sanction more severe than ... confinement in a secure facility or placement in a nonsecure facility or residence for a period of [eighteen] months." *Id.* at § 5.2(A). Thus, the District Court's disposition exceeded the recommended *maximum* term of confinement by over five years.

More importantly, the District Court offered no support for its conclusion that a seven-year sentence was necessary to effectuate C.K.'s successful treatment, nor does the PSR provide any support for such a conclusion. Although C.K.'s initial evaluation, conducted over a year before sentencing, recommended that he be placed in a structured environment, at the time of sentencing, C.K. had already been placed in a residential treatment facility in accordance with that recommendation. Moreover, the District Court's finding that C.K. was not performing well at Normative is unsupported by the record. The PSR indicated that, after a bumpy first month, C.K. fared well at Normative, receiving positive reports from his counselors, participating in group and individual treatment "without resistance," improving his grades, and joining the choir. The treating professionals at Normative, who had charge of C.K. prior to sentencing, estimated that he could be ready to return to his community within a year. Given that all of C.K.'s serious problems at Normative occurred in his first month there, when he was experiencing his first time away from home and from Native American family members, the District Court's apparent emphasis on this time period is unfathomable.

By its terms, C.K.'s sentence exceeded what was necessary for treatment by more than five years. Even if C.K. required longer than eighteen months to complete a treatment program successfully, there is no support for the conclusion that he would need seven years to do so, or that custody by the Bureau of Prisons was the least restrictive means to accomplish such treatment. Indeed, it appears that continued treatment at Normative would have been a perfectly viable option.

In short, nothing in the record indicates that the District Court weighed whether custody by the Bureau of Prisons was the least restrictive means to accomplish C.K.'s successful rehabilitation, given the needs of C.K. and the community. Although we note that the District Court explicitly found that the disposition it selected was chosen for purposes of "treatment," mechanical articulation of rehabilitation as a goal is not sufficient. The District Court must provide a reasoned basis for why it has rejected less restrictive interventions. *See United States v. Daniels,* 446 F.2d 967, 971 (6th Cir.1971) ("District court grossly abused [its] discretion by failing to evaluate the relevant information before [it] with due regard for the factors appropriate to sentencing."); *see also* Sue Righthand & Carlann Welch, *Juveniles Who Have Sexually Offended: A Review of the Professional Literature.* OJJDP (March 2001) (hereinafter "OJJDP Literature Review") at xviii ("Treatment [of juvenile sexual offenders] should be provided in the least restrictive environment necessary for community protection [and] ... should involve the least intrusive methods that can be expected to accomplish treatment objectives.").

Adding to the arbitrariness of its decision, the District Court utterly failed to

consider C.K.'s own history of victimization, or, worse yet, considered it as a factor which should *increase* C.K.'s time in detention. *See Williams v. Oklahoma*, 358 U.S. 576, 585, 79 S.Ct. 421, 3 L.Ed.2d 516 (1959) ("In discharging his duty of imposing a proper sentence, the sentencing judge is authorized, if not required, to consider all of the mitigating and aggravating circumstances involved in the crime."). C.K.'s own history of abuse, if anything, counsels against imposing the most severe sentence, not in favor of it. The District Court also failed to consider that C.K. had shown progress since the initial intervention by FBHC—both in coming to terms with his own abuse and in accepting responsibility for his conduct and his need for treatment. C.K.'s progress in treatment was sustained, with some short digressions, through his counseling with Dilts as well as his time at Normative. Given C.K.'s serious needs, the implicit expectation that he would respond instantly to treatment is patently unreasonable and shows a startling lack of understanding or appreciation for either trauma or adolescent psychology.

Additionally, it is relevant to our determination that the District Court's sentence effectively results in C.K.'s release from custody without any intermediate period of supervision or transitional services. As a result, C.K. will not be able to benefit from those forms of treatment which studies have shown to be most effective for recovering juvenile sexual offenders, such as community-based treatment and family therapy.[9] As a result, the disposition effectively decreases C.K.'s chances for successful rehabilitation, a result which is clearly contrary to the intended purposes of the FJDA.

Finally, the District Court made no findings in support of his placement of C.K. in South Dakota, the location of C.K.'s victimization, as opposed to continuation of treatment at Normative or treatment within or near C.K.'s community. The FJDA explicitly requires that "[w]henever possible, the Attorney General shall commit a juvenile to a foster home or community based-facility located in or near his home community." 18 U.S.C. § 5039. Given C.K.'s status as a Native American, and the fact that the suggested placement removed him inordinately far from access to his family, his tribe, and the support mechanisms he had in the Fort Belknap Indian community, the lack of findings underlying such a placement is problematic.[10]

9. Studies reviewed by the Office of Juvenile Justice and Delinquency Prevention ("OJJDP") have found that successful treatment of juveniles who have sexually offended is facilitated by the participation of the child's family, *see* OJJDP Literature Review at 41, and that "programs designed to exclusively focus on sex-offending behaviors are of limited value" as are "quasi-corrections models." *Id.* at 39–40. In addition, "an extensive review of studies investigating recidivism rates among juvenile offenders ... noted [that] ... 'virtually all of the studies show ... that relatively few [juvenile sex offenders] are charged with a subsequent sex crime.'" *Id.* at xvii. *See also* Wendy E. Rowe, JUVENILE SEX OFFENDERS: A FOLLOW-UP STUDY OF REOFFENSE BEHAVIOR, *Executive Summary.* Washington State Institute for Public Policy. (September 1991) (finding that sexual recidivism of juvenile sexual offenders post-treatment was "very rare" and that "institutionalized youth were significantly more likely than those who were treated in the community to commit new offenses during their first year at risk.").

10. Because of the structure of the FJDA, Native American youth are disproportionately subject to federal court jurisdiction for their delinquency offenses. *See* Amy J. Standefer, *The Federal Juvenile Delinquency Act: A Disparate Impact on Native American Juveniles.* 84 MINN. L. REV. 473, 474–75 (1999). Given the unique role they have in Native American young people's lives, district courts should give due consideration to the unique concerns and needs of these young people. *See* 25 U.S.C. § 1902 (2003) ("[I]t is the policy of this

In conclusion, on this record, the length of custody imposed under the District Court's disposition, and the highly restrictive environment selected for that custody, are both arbitrary and in direct contravention of the rehabilitative purposes of the FJDA. Under the District Court's sentence, C.K. would spend over one-third of his brief and calamitous life, and all of his adolescence and early adulthood, in institutions for delinquent and troubled youth. This despite the fact that C.K. had no prior offenses or juvenile record, had severely suffered as a result of abuse himself, had made noticeable progress in a less restrictive treatment environment prior to sentencing, and clearly took responsibility for his conduct through his plea as well as his statement in court. The District Court's disposition constitutes an abuse of discretion. We therefore vacate the disposition and remand for resentencing in accordance with this opinion.

**REVERSED, VACATED and REMANDED.**

LAY, Circuit Judge, concurring:

I strongly endorse and join in Judge Ferguson's opinion as it constitutes an outstanding exposition relating to the sentencing of juvenile offenders under the Federal Juvenile Delinquency Act (FJDA), 18 U.S.C. § 5031 et seq. To sentence a young man to a long prison term as did the district court is to provide the catalyst for dehumanization, turning juvenile offenders into hardened criminals, away from youthful pursuits and toward a life of crime. The price our Nation pays in filling our prisons with young people who have committed a crime not only exacts an exorbitant economic cost, but more importantly uses the full force of the law to create a human waste that cannot be measured. Judge Ferguson's opinion will not only become the beacon light for the sensible treatment of juvenile offenders, but also focus attention on the overall punitive sentencing procedures that are currently applied in federal court. In my judgment, this opinion serves as one of the strongest statements that a federal judge has made as it relates to the overall sentencing of human beings.

GOULD, Circuit Judge, concurring in part, dissenting in part:

I agree with the majority that C.K.'s detention is reviewed for abuse of discretion, *United States v. Juvenile*, 38 F.3d 470, 472 (9th Cir.1994), but I disagree with the majority's application of that standard. I conclude that resentencing is necessary only because the record does not adequately show justification for confinement of C.K. so far from C.K.'s home in Huron, South Dakota or in Santa Fe, New Mexico. If there were specific and valid reasons, as there may be, for the district court's decision on place of confinement, then the specified recommendation to the Bureau of Prisons of these locations might be warranted; but absent such reasons, in my view C.K.'s detention in the places specified does not comport with 18 U.S.C. § 5039. On the other hand, contrary to the majority's view, I conclude that it was well within the district court's customary province and sound exercise of discretion to conclude that C.K. required detention until the age of 21. Accordingly I respectfully dissent from majority's opinion on that ground. I also regret that I cannot join the majority's discussion of sentencing principles, because the majority has understated the risk to the public posed by C.K.

Nation to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families.").

and the scope of the district court's legitimate discretion to address that risk.

Under the Federal Juvenile Delinquency Act ("FJDA"), the maximum term for which a juvenile under the age of eighteen may be officially detained is the lesser of the date of the juvenile's twenty-first birthday and the maximum term "that would have been authorized if the juvenile had been tried and convicted as an adult." 18 U.S.C. § 5037(c); *United States v. G.L.,* 143 F.3d 1249, 1251 (9th Cir.1998). The latter limit is determined with reference to the Sentencing Guidelines, 18 U.S.C. § 3553(b). *United States v. R.L.C.,* 503 U.S. 291, 306, 112 S.Ct. 1329, 117 L.Ed.2d 559 (1992).[1] Here, the applicable guideline range, if C.K. had been tried as an adult, was 78 to 97 months. C.K. was sentenced to official detention for 81 months, until C.K.'s 21st birthday, which is within the range specified by statute.

The district court did not abuse its discretion in regard to the scope of confinement. Rehabilitative measures should be considered when sentencing a juvenile. 18 U.S.C. § 5039; *R.L.C.,* 503 U.S. at 298 n. 2, 112 S.Ct. 1329 ("the Juvenile Delinquency Act does not completely reject rehabilitative objectives"). Here, the district court considered and provided for C.K.'s rehabilitative needs by recommending that he receive treatment. The majority mistakenly assumes that, because the district court recommended a minimum of 18 months of rehabilitation, C.K. would serve the remainder of C.K.'s detention without rehabilitative treatment. This assumption does not follow from the district court's order, nor from the FJDA. *See* 18 U.S.C. § 5039 ("Every juvenile who has been committed shall be provided with ... counseling, education, training, and medi-

cal care including necessary psychiatric, psychological, or other care and treatment.").

The district court carefully reviewed C.K.'s record and found that official detention was warranted by virtue of the seriousness of the offense that C.K. admitted to committing, the history of prior offenses by C.K. of the same type beyond the charge admitted, and C.K.'s poor response to rehabilitative treatment. The district court also found that C.K. was at serious risk of returning to C.K.'s prior behavior. The district court's ruling on confinement took into account the best interests of both C.K. and the public.

C.K.'s interests were best served because, as sentenced, C.K. would be in a structured environment in which treatment was possible. The interests of the public were best served because, as sentenced, C.K. would not pose a likely threat to other children while a minor. There is no question but that abuse of C.K. by others when he was a young child may have contributed to C.K. becoming, in turn, a repeat abuser of younger children. The majority's approach to this is to give him a pass at an earlier age, but this approach ignores that C.K.'s predatory abuse of other children, if not restrained, can continue a cycle of abuse and corruption of youth. The district court's concern for the public's interest was not precluded by the FJDA, but rather encouraged by it. The district court did not abuse its discretion by requiring official detention for C.K., nor by the length of the detention, given the risk that C.K. posed to the community by committing further sexual abuse.

Despite my conclusion that, in general, the district court did not abuse its discre-

---

**1.** The Guidelines set the maximum term of official *detainment. R.L.C.,* 503 U.S. at 306, 112 S.Ct. 1329. The sentencing court must determine the appropriate sentencing range. *Id.*

tion, the recommendation that C.K. receive rehabilitation in either Huron, South Dakota or Santa Fe, New Mexico appears on the record before us to be an abuse of discretion. Huron is nearly 850 miles (at least a 16–hour drive) away from C.K.'s family in Hays, Montana. Santa Fe is, of course, even further away. This recommendation by the district judge was given without explanation or justification. Absent very good reasons for confinement at such a distance from C.K.'s home, C.K.'s confinement in the locations specified would be contrary to the presumption that it is generally beneficial for all to maintain the juvenile in close proximity with his or her family and home community. *See* 18 U.S.C. § 5039 ("Whenever possible, the Attorney General shall commit a juvenile to a foster home or community-based facility located in or near his home community."). In light of this provision for a juvenile's confinement proximate to family whenever possible, I would interpret the FJDA to require that the district court must provide very good reasons to justify recommending or ordering that a juvenile be detained so far from his or her home and community. The district court did not provide such justification. I would vacate the sentence to permit the district court to reassess this part of the sentence and to explain the grounds for decision. I agree that a resentencing is needed, but only on this narrow ground.[2]

---

2. If, on remand, the district court adequately justifies why C.K. should be located so far away from C.K.'s home or orders C.K.'s detention to be served in the rehabilitation facility nearest to Hays, Montana, then I would hold that the sentence is within the district court's discretion.