# United States Court of Appeals
## For the First Circuit

No. 19-1652

UNITED STATES OF AMERICA,

Appellee,

v.

CRISTIAN SERRANO-DELGADO,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Francisco A. Besosa, U.S. District Judge]

Before

Howard, Chief Judge,
Thompson and Kayatta, Circuit Judges.

Victor Gonzalez-Bothwell, Assistant Federal Public Defender, with Eric Alexander Vos, Federal Public Defender, Franco L. Pérez-Redondo, Assistant Federal Public Defender, and Liza L. Rosado-Rodríguez, Research and Writing Specialist, on brief, for appellant.

David C. Bornstein, Assistant United States Attorney, with whom W. Stephen Muldrow, United States Attorney, and Mariana E. Bauzá-Almonte, Chief, Appellate Division, were on brief, for appellee.

March 22, 2022

**KAYATTA, Circuit Judge.** Cristian Serrano-Delgado drove a car that transported two passengers to and from a robbery of a bar, during which one of his passengers killed an off-duty police officer. The government charged all three men with conspiracy to commit a robbery, committing the robbery, and discharging a firearm in relation to a crime of violence resulting in death. The two men who held up the bar negotiated guilty pleas, but Serrano opted to go to trial. After a jury found him guilty on all counts, the district court sentenced him to thirty years in prison. Serrano now challenges several aspects of his trial and sentence. Finding none of his challenges availing, we affirm.

## I.

## A.

The events of this case occurred on a single night in 2017, during which Herol Café -- a bar and restaurant in Ponce, Puerto Rico -- was robbed and a patron was killed. Before the robbery, Serrano had been driving two other men (Jonathan Valentín-Santiago and Rubén Miró-Cruz) through the streets of Ponce. Security cameras recorded his car as he drove past Herol Café three times in five minutes. After the third pass-by, Serrano parked the car up the block and pointing away from the bar, even though there was plenty of parking much closer to the bar on both sides of the street.

- 2 -

Valentín and Miró got out of the car and headed toward Herol Café. Serrano waited near the trunk of the vehicle, where (as he later admitted to an FBI agent) he "made as though he was looking for something." He testified at trial, however, that he was innocently tying down boxes of sneakers he had in the trunk because Valentín had been complaining of the noise while they were driving.

Outside the bar, a group of men were playing dominoes. With his face covered by a bandana, Valentín announced to the group that he was holding them up and that he and his partner would kill anyone who moved. The men put their jewelry and money on the table. Valentín then entered the bar while Miró, also masked and armed with a knife, stood watch over the men outside. Inside, Valentín pulled out a gun and ordered the patrons to give him money. One of the patrons, an off-duty police officer, took out his gun and fired at the robber, hitting Valentín in the abdomen three times. Valentín returned fire, killing the officer.

Upon hearing the shots, Miró raced back to the car. Seconds later, Valentín exited and began to hobble toward the car. There was cross-fire in the street as Valentín shot behind his back at the bar while the owner, using the officer's gun, returned fire. Serrano waited for Valentín to get into the car before he drove off. An eyewitness in a nearby building saw Valentín, with his face still masked, firing his pistol while he limped toward

the car. She testified that the car "left fast" as soon as Valentín got in. Serrano claimed at trial that, upon returning to the car, Valentín threatened to kill him unless he drove to a hospital. A tire blew out on the way, so Serrano parked on a nearby street and took a bleeding Valentín out of the car. He then called his mother to pick him up because he didn't have a spare tire.

A police officer who responded to the scene -- and who had already watched security footage of the incident -- heard a radio report of an injured person in a nearby subdivision. He went to investigate and "immediately recognized . . . the person who shot" the off-duty officer because he was wearing "the same clothes" and bandana. He radioed a medical emergency, and Valentín was quickly transported to the hospital.

Serrano, meanwhile, had been picked up by his mother. Once home, he gathered his brother and girlfriend to return to his car to fix the tire. Back at the car, Serrano started to clean Valentín's blood off the seats. He found a shirt, a cap, a kerchief, and a small rag, some of which were soaked in blood, and threw it all onto the property of an abandoned house nearby. Serrano's brother was changing the tire when a police officer arrived, recognized the car from the description of the one that sped away from the robbery, and arrested Serrano, his girlfriend, and his brother.

After being Mirandized, Serrano spoke to an FBI agent. During the interview, he told the agent that Miró lived in the Dr. Pila Housing Project. The next day, the police arrested Miró at that address. Serrano later testified at trial that he had never met Miró before that night.

**B.**

Serrano, Valentín, and Miró were charged with conspiracy to commit a robbery affecting interstate commerce in violation of the Hobbs Act (18 U.S.C. § 1951(a)) and committing the Herol Café robbery (18 U.S.C. § 1951(a)), plus two added counts related to Valentín's gun: first, for discharging a firearm "during and in relation to crimes of violence" (18 U.S.C. § 924(c)(1)(A)(iii)), and second, for causing the death that resulted (18 U.S.C. § 924(j)).[1] Valentín and Miró each pleaded guilty to a reduced version of the charges, but Serrano chose to go to trial. After a 7-day trial, a jury convicted Serrano on all counts.

**II.**

For purposes of this appeal, there is no dispute that Valentín and Miró committed an armed robbery at a bar during which Valentín shot a patron to death. The principal question in this case is whether the jury properly found Serrano also liable for those acts. To establish that vicarious liability, the government

---

[1] A superseding indictment added a fifth charge solely against Valentín for being a felon in possession of a firearm.

- 5 -

took a two-step approach.  First, it charged him with both aiding and abetting the robbery (by serving as the driver) and with conspiring to commit the robbery; second, it secured a so-called Pinkerton instruction, which informed the jury that -- if it found Serrano guilty of the charged conspiracy -- it could also find him guilty of the firearm discharge and resulting death if those acts were both in furtherance of the conspiracy and reasonably foreseeable to Serrano.  See Pinkerton v. United States, 328 U.S. 640, 647-48 (1946).  The jury so found.

Challenging his conviction in toto, Serrano argues that no rational jury could have found that he knew that Valentín and Miró were planning on robbing the bar, hence he could not be liable for aiding and abetting the robbery or for conspiring to commit the robbery.  In short, he was an unwitting dupe, not a witting participant.  Relatedly, he contends that the Pinkerton instruction should not have been given and that the Pinkerton instruction as given was too imprecise and confusing.  Serrano also challenges two evidentiary rulings by the trial court rejecting his effort to introduce exculpatory testimony from Valentín, and he argues that his convictions under sections 924(c) and (j) must be reversed because they may have been premised on acts that are not crimes of violence (as required by statute). Finally, he contends that his 30-year sentence is disproportionate

to his co-conspirators' sentences and that, regardless, it is otherwise substantively unreasonable.

### A.

We consider first Serrano's contention that there was insufficient evidence to find beyond a reasonable doubt that he was aware of what Valentín and Miró planned to do, much less that he agreed to participate and help them as the driver. "The test is whether, taken as a whole and viewed in the light most favorable to the government, the evidence, and all legitimate inferences to be drawn therefrom, would support a rational trier of fact's finding of guilt beyond a reasonable doubt." United States v. Martinez, 922 F.2d 914, 923 (1st Cir. 1991) (citing Jackson v. Virginia, 443 U.S. 307, 319 (1979)). Our review is de novo. United States v. Portalla, 496 F.3d 23, 26 (1st Cir. 2007).

Certainly Serrano behaved exactly as he would have had he been part of a three-person group set on committing a robbery. He was with Miró and Valentín before the robbery. He provided the transportation to take them to the bar. He drove by the bar three times. He let his two passengers out of the car up the block -- even though there was plenty of parking closer -- pointing away from the bar. He waited for the masked robbers to return, even after the shooting began. He then served as a get-away driver, speeding off from the scene. And, finally, he tried to cover up evidence of his involvement.

Serrano offered the jury an innocent interpretation of this evidence: Valentín just introduced him to Miró that night, and Serrano took them on a joy ride with no idea that he was assisting them in a robbery, at least until they returned to the car, at which point he claims that he was compelled at gunpoint to drive his passengers away.

While a reasonable juror might have believed Serrano's story, after hearing him testify these jurors did not. And we cannot say that the jurors lacked a basis for finding the government's version of events correct beyond a reasonable doubt. A juror could reasonably have thought it unlikely that Valentín and Miró would depend on an unwitting get-away driver who might act quite unpredictably when the robbery ensued. Plus, why would Serrano stand waiting outside at the trunk of the car while they went to the bar unless he was serving as a lookout and expecting them to return quite quickly? And what did he think the repeated drive-bys were all about? Perhaps most damning is Serrano's contemporaneous statement to an FBI agent that he felt a need to feign looking in his trunk, followed by a different explanation at trial. The discrepancy and the sense of guilt it suggests could have led a reasonable juror to be skeptical of his whole story. Cf. United States v. Marchena-Silvestre, 802 F.3d 196, 203 (1st Cir. 2015). Similarly, Serrano's knowledge of Miró's address did

not fit easily with his claim that he had just met Miró that evening.

Viewing all of this in the light most favorable to the verdict, there was sufficient evidence for a jury to find beyond a reasonable doubt that Serrano knew from the outset what Valentín and Miró were up to. And if he did what he did with such advance knowledge, he was clearly guilty of both robbery as an aider and abettor, see United States v. Palmer, 203 F.3d 55, 66 (1st Cir. 2000), and of conspiring (i.e., agreeing) to assist in that robbery, see United States v. McDonough, 727 F.3d 143, 156 (1st Cir. 2013) (explaining that proof of conspiracy "may include the defendants' acts that furthered the conspiracy's purposes").

**B.**

We turn next to Serrano's challenges to the use of a Pinkerton instruction, which allows a jury to find a defendant liable for the substantive crimes his co-conspirators committed in furtherance of the conspiracy if it were reasonably foreseeable that those crimes would occur. United States v. Bucci, 525 F.3d 116, 132 (1st Cir. 2008).

The instruction gets its name from a 1946 Supreme Court opinion arising out of an appeal by two brothers who conspired to defraud the United States of tax revenue. Pinkerton, 328 U.S. at 641. Although they agreed to commit fraud, only one of the brothers actually committed the particular fraud on which the

- 9 -

convictions were sustained. Id. at 645. Indeed, the other brother was incarcerated during the relevant time period. Id. at 648 (Rutledge, J., dissenting in part). Nevertheless, the Court held that "acts in furtherance of the conspiracy are . . . attributable to the other[] [co-conspirators] for the purpose of holding them responsible for the substantive offense." Id. at 647 (majority op.). The Court then put limits on the breadth of its holding, explaining that a co-conspirator could not be liable if the substantive offense "was not in fact done in furtherance of the conspiracy, did not fall within the scope of the unlawful project, or was merely a part of the ramifications of the plan which could not be reasonably foreseen as a necessary or natural consequence of the unlawful agreement." Id. at 647–48.

We have applied Pinkerton's formulation consistently since then. See, e.g., United States v. Vázquez-Botet, 532 F.3d 37, 62 (1st Cir. 2008) ("[U]nder the Pinkerton doctrine, a defendant can be found liable for the substantive crime of a coconspirator provided the crime was reasonably foreseeable and committed in furtherance of the conspiracy."). We have also cautioned, however, that "a Pinkerton charge 'should not be given as a matter of course.'" United States v. Sanchez, 917 F.2d 607, 612 n.4 (1st Cir. 1990) (quoting United States v. Sperling, 506 F.2d 1323, 1341 (2d Cir. 1974)). In some complex cases, the charge can cause confusion. See United States v. Manzella, 791 F.2d 1263,

1267 (7th Cir. 1986). As an example, we have said that concern can arise "particularly where the jury is being asked . . . to infer, on the basis of a series of disparate criminal acts, that a conspiracy existed." United States v. Vázquez-Castro, 640 F.3d 19, 25 (1st Cir. 2011) (quoting Sanchez, 917 F.3d at 612 n.4); see also Sperling, 506 F.2d at 1342 (disapproving of Pinkerton instruction where evidence of substantive acts was great, but the evidence of a conspiracy linking them together was weak, because those "circumstances [are] quite different from those that gave [Pinkerton] birth"). At the same time, we have acknowledged that "some interplay between the jury's assessment of guilt on the substantive counts and the conspiracy charge is both natural and appropriate." See United States v. Wester, 90 F.3d 592, 597 (1st Cir. 1996).

Here, Serrano argues that this is a case in which it was error to give the charge at all due to the caution expressed in Sanchez and Sperling. He also argues on appeal that the instruction as given was deficient in form because it was "compressed," "overcomplicated the jury's task," and left "complex analytical tasks totally unexplained." The government responds that Serrano failed to preserve these objections and that, in any event, the district court did not err in giving the charge. As we next explain, we find the objection to the decision to give a Pinkerton instruction preserved, but unconvincing; however, we

conclude that Serrano failed to preserve any objection to the form of the instruction as given.

**1.**

The government contends that Serrano failed to preserve either of his objections to the Pinkerton charge.

As to his objection that a Pinkerton charge should not have been given at all, the government contends that his post-charge objection did not meet the specificity requirement of Federal Rule of Criminal Procedure 30(d). We disagree. Our circuit is an outlier in that we deem objections to jury instructions automatically unpreserved unless made after the instructions are given and before the jury retires. See United States v. Roberson, 459 F.3d 39, 45 (1st Cir. 2006) (explaining that, in this circuit, "a litigant must lodge a specific objection and state the grounds for the objection after the court has charged the jury and before the jury begins deliberations" (emphasis in original)). This outlier rule has recently elicited significant criticism from several members of this court. See United States v. Pérez-Rodríguez, 13 F.4th 1, 35 (1st Cir. 2021) (Lipez, J., concurring) (explaining that our idiosyncratic requirement that defendants re-raise their jury instruction challenges after the charge is a-textual and out of step with modern trial practice); id. at 35-36 (Barron, J., concurring) (same); id. at 37 n.19 (Kayatta, J., dissenting) (same). Our panel nevertheless has no

power to ignore it as circuit precedent.  We also, though, have no reason to expand upon it or to construe it broadly.

The relevant sequence here was as follows:  The district court entertained proposals and objections as to jury instructions before instructing the jurors.  Serrano submitted a written objection to the proposed Pinkerton instruction.  Quoting Sanchez, he explained that this circuit has cautioned that "a Pinkerton charge should not be given as a matter of course," "particularly where the jury is being asked to make the converse inference; that is, to infer, on the basis of a series of disparate criminal acts, that a conspiracy existed."  917 F.2d at 612 n.4 (internal quotation marks omitted).  He argued that this case presents that precise concern because "the jury must infer from different acts, all based on circumstantial evidence, that a conspiracy existed."

The court overruled the objection and gave the Pinkerton instruction.  After giving all the instructions, the district court again invited objections.  Serrano's counsel once more objected to the decision to give the Pinkerton instruction, stating:

> It is an instruction that should not have been included because of its broad application. This case in the indictment and the evidence presented talked about aiding and abetting, and the Pinkerton doctrine gives the jury another option, a broader option that, without knowingly, it can find the Defendant guilty. And we cite United States v. Sanchez, 971 F.2d 607, from the First Circuit, 1990.

The government questions whether the objection was nevertheless too cryptic because counsel simply referred to Sanchez without explaining why he was citing the case. See Fed. R. Crim. P. 30(d) (requiring counsel to "inform the court of the specific objection" to a jury instruction and "the grounds for the objection"). But "Sanchez" by that point was already shorthand for the concern being conveyed. Certainly if counsel objected to admitting a defendant's confession by saying "no Miranda warning," she would not need to explain what Miranda is. Sanchez, of course, is not so well known generally, but in that courtroom at that time, everyone knew what Sanchez was and of its relevance precisely because of the pre-charge communications.

So while a pre-charge objection by itself preserves nothing under our precedent, there is no reason why we need to ignore it in deciding whether a post-charge objection was sufficiently detailed to preserve a specific objection. In this manner, we retain any benefit sought to be attained by our post-charge requirement (i.e., that the judge knows that a specific objection has not been dropped or satisfied by the instructions as given), while avoiding any necessity to belabor a point well understood by the judge.

That leaves the matter of the form of the Pinkerton instruction as given. On this, we agree with the government that Serrano preserved no objection. Indeed, his capable counsel in

- 14 -

raising numerous objections to various instructions voiced no concern at all that the form of the Pinkerton instruction was flawed in any way.

### 2.

Turning first to the merits of Serrano's preserved objection to the Pinkerton charge, we begin with an examination of the work done by the charge. The substantive crimes here are the robbery, the discharge of a firearm in relation to a robbery, and the resulting death.

The Pinkerton charge performed no work for the robbery conviction; rather, the case for finding Serrano to have aided and abetted the robbery turned entirely on whether Serrano's conduct as driver was unwitting. As we have explained, the evidence supported a negative answer beyond a reasonable doubt. Nor was there any reason to rely on the Pinkerton charge to reach that conclusion. To the contrary, in this case it was Serrano's own participation in the robbery that provided the basis for inferring an agreement to commit the robbery, not vice versa. Thus, the jurors could not have found him guilty of conspiring to aid and abet the robbery without first concluding that he did in fact aid and abet the robbery.

The work done by the Pinkerton charge concerned, instead, the latter two crimes (the discharge of the gun and the resulting death). Without the Pinkerton charge, the jurors could

have found Serrano guilty on those counts only under an aiding-and-abetting theory, which would have required the government to prove beyond a reasonable doubt that Serrano had actual advance knowledge that Valentín possessed the gun.  See Rosemond v. United States, 527 U.S. 65, 77-80 (2014).  Pinkerton, by contrast, allowed a finding of liability if the use of the gun and resulting death were merely "reasonably foreseeable" (and in furtherance of a conspiracy).

Given that aiding and abetting a crime could often support an inference of conspiracy to commit the crime, one might ask why Pinkerton is not more frequently employed.  The answer, we suspect, is that prosecutors and district courts prudently pay heed to our warnings regarding its use when the evidence of a separate agreement is not strong and the case is complex.

In any event, Pinkerton is the law in federal court, and there was nothing confusing about its application in this easy-to-understand case centered on a single robbery in which all three suspects substantially participated in their respective roles.  Nor is this a case in which the crimes to which the Pinkerton charge was relevant (the discharge and the resulting death) were themselves the basis for inferring a conspiracy in the first instance.  Rather, what we have here is what one academic has dubbed "[t]he classic example" of someone liable under Pinkerton, namely "[t]he lookout who stays behind in the car."  Jens David

- 16 -

Ohlin, Group Think: The Law of Conspiracy and Collective Reason, 98 J. Crim. L. & Criminology 147, 147-48 (2007). The lookout "is just as guilty as" the bank robber who shoots a security guard, "as long as it was reasonably foreseeable that the plan might go awry and result in physical violence." Id. at 148. Accordingly, the district court did not abuse its discretion in deciding to give a Pinkerton instruction.

### 3.

As for Serrano's unpreserved argument that the Pinkerton instruction was confusing as given, Serrano can only succeed if he meets the stringent requirements of plain error review, under which:

> a reviewing court may set aside a challenged portion of a criminal sentence if, and only if, the appellant succeeds in showing (1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings.

United States v. Padilla, 415 F.3d 211, 218 (1st Cir. 2005) (en banc) (cleaned up).

Serrano on appeal makes no effort to show that he can satisfy the plain error standard in seeking review of the particular form of the instruction. Even after the government waved the plain error flag in its brief, Serrano failed to argue in reply either that this argument was preserved or that he meets

the plain error standard. See United States v. Pabon, 819 F.3d 26, 33-34 (1st Cir. 2016) (holding that plain error review is waived if its four-part test is not argued at least in reply).

The instruction given by the district court[2] largely tracks the circuit's model Pinkerton instruction. See Pattern Jury Instructions for the District Courts of the First Circuit § 4.18.371(2). Arguably that instruction could be criticized for permitting liability if it is foreseeable a co-conspirator "might commit" the charged substantive crime, rather than Pinkerton's formulation, which discussed whether the offense could be "reasonably foreseen as a necessary or natural consequence of the unlawful agreement." Pinkerton, 328 U.S. at 648. And it would have been better had the district court separated out each of the counts rather than linking them disjunctively in a single instruction. But there is nothing here that comes close to the type of miscarriage of justice that might arguably have allowed us to overlook Serrano's waiver and also find plain error.

c.

We turn next to the gun charges. Section 924(c)(1)(A)(iii) has two elements: The government has to prove beyond a reasonable doubt that, (1) "during and in relation to" a "crime of violence," (2) the defendant "discharged" a

_____

2 We have attached as an appendix to this opinion the jury instruction given in this case.

firearm.  The 924(j) count only "requires proof of one additional fact: the death."  United States v. García-Ortiz, 657 F.3d 25, 28 (1st Cir. 2011).

Serrano does not argue that the government failed to prove a discharge of the gun or the resulting death.  He argues instead that he did not actually know that a gun would be used.  But actual knowledge is not required under Pinkerton.  United States v. Carter, 19 F.4th 520, 527 (1st Cir. 2021).  And, presumably because few robbers enter a busy bar to commit a robbery without a means of deterring resistance, he does not claim that the use of a gun would not have been reasonably foreseeable to one who knew of the intended robbery.

Serrano's argument trains instead on the statutory requirement that the discharge and death need to have occurred during and in relation to a crime of violence.  While Hobbs Act robbery is a crime of violence, see United States v. García-Ortiz, 904 F.3d 102, 109 (1st Cir. 2018), the government concedes that conspiring to commit such a robbery no longer counts as one, see, e.g., United States v. Lara, 970 F.3d 68, 74 (1st Cir. 2020) (accepting the government's concession on this precise point).  Serrano therefore reasons that the jurors might have found that the discharge and death occurred only during and in relation to the conspiracy, not the robbery.  And pointing to the "categorical approach" employed in other contexts, see, e.g., Descamps v. United

- 19 -

States, 570 U.S. 254, 260-61 (2013) (explaining the categorical approach used to determine whether a past conviction qualifies as a crime of violence under the Armed Career Criminal Act), he concludes that we must assume that the jurors so found, see In re Gomez, 830 F.3d 1225, 1227 (11th Cir. 2016) (concluding that a "crime of violence" finding cannot be upheld where a general verdict makes it impossible to tell whether the jury "reach[ed] a unanimous agreement on during which crime it was that [the defendant] possessed the firearm").  Finally, he contends that the Pinkerton instruction "provided a theory of guilt that would leave no viable crime of violence predicate whatsoever" because "it is [e]minently possible that [his] substantive convictions rested on the jury's conspiracy finding."

Whatever one may think of this line of reasoning in the abstract, it entirely fails on this record.  Simply put, it is not possible for the jurors to have found that the discharge and death occurred during and in relation to the conspiracy, but not during and in relation to the robbery.  No party suggested to the jury otherwise.  Nor did the jurors need to decide whether robbery is a crime of violence, which is a matter of law; they only needed to have decided beyond a reasonable doubt that the discharge and death occurred during and in relation to the robbery.  And there is no way to read the general verdict as not resting on such a finding because, as we have explained above, on these facts the jury could

have found Serrano guilty of conspiracy only by first concluding that he knowingly joined the robbery as the get-away driver.

## D.

Serrano's evidentiary challenges arise out of his attempt to secure the benefit of helpful testimony from Valentín, the shooter. At his change-of-plea hearing, Valentín agreed that he had conspired with both Miró and Serrano to commit the robbery at Herol Café. However, once Valentín was convicted, but before he was sentenced, he turned his attention to trying to get Serrano off the hook. He did this by telling his attorney that Serrano actually had no prior knowledge that Valentín and Miró were planning a robbery. Valentín's attorney then conveyed this information to Serrano's counsel, and to the government and the judge hearing Serrano's case.

Serrano asked first that the court compel Valentín to testify. In response, Valentín invoked his right not to testify under the Fifth Amendment, citing the fact that if he testified as forecast he could be admitting that he committed perjury at his change of plea hearing when he agreed that Serrano was in on the planned robbery. After having Valentín confirm under oath and outside the presence of the jury his refusal to testify, the trial court rejected Serrano's request.

Serrano's counsel then moved to call Valentín's attorney to tell the jury what Valentín had told her. In that manner,

Serrano sought to get the benefit of Valentín's assistance without Valentín having to swear under oath to any statement contrary to his testimony at his change of plea hearing, and Valentín would also be insulated from cross-examination by the government. The trial court declined this gambit. It refused to allow Serrano to call Valentín's attorney as a witness. Serrano now argues that the district court twice erred: first, by conducting an inadequate voir dire of Valentín; and second, by rejecting Serrano's back-up plan to call Valentín's attorney to testify as to what Valentín told her.

**1.**

When Valentín was called and the Fifth Amendment issue was raised, Serrano's counsel told the court, "[A]ll I need is [Valentín] to take the stand and say if he is going to take the Fifth or not." Government counsel agreed, noting that while the government would normally insist on a question-by-question assertion of the Fifth Amendment privilege, here it agreed with Serrano's proposed general inquiry because his counsel had already provided the questions to the court. The court then did precisely as Serrano's counsel proposed: It called Valentín to the stand in a voir dire hearing outside the presence of the jury and asked him if he would "take the Fifth Amendment" if called to testify. When Valentín answered "[y]es," the court denied Serrano's request to call Valentín. Not surprisingly, Serrano's counsel did not object

to the court having done precisely what Serrano's counsel asked the court to do. Rather, Serrano's counsel moved immediately for leave to call Valentín's attorney as a witness.

In view of the foregoing, any objection to the procedure employed by the district court in determining whether Valentín should be called as a witness was waived. Absent extreme circumstances not present here, a defendant cannot ask a trial court to follow a certain procedure and then be heard to complain only later on appeal that the trial court did as requested. See United States v. Chen, 998 F.3d 1, 6 (1st Cir. 2021) ("An issue may also be waived if counsel's own conduct invited the trial judge's ruling."); see also United States v. Kakley, 741 F.2d 1, 3 (1st Cir. 1984) (rejecting a claim of error because counsel requested the challenged instruction).

**2.**

By contrast, Serrano preserved his challenge to the denial of his request to call Valentín's attorney to testify that Valentín told her that Serrano had no advance notice of the robbery. We review this preserved objection to the district court's evidentiary ruling for abuse of discretion and will reverse "only if [we are] 'left with a definite and firm conviction that the court made a clear error of judgment.'" United States v. Sweeney, 887 F.3d 529, 537 (1st Cir. 2018) (quoting United States v. Joubert, 778 F.3d 247, 253 (1st Cir. 2015)).

As the sole basis for proffering the out-of-court statement attributed to Valentín, Serrano relies on Rule 804(b)(3). To be admissible under Federal Rule of Evidence 804(b)(3), the out-of-court statement must be, inter alia, "supported by corroborating circumstances that clearly indicate its trustworthiness." Not having been born yesterday, the district court was not persuaded that the circumstances here clearly indicated trustworthiness. Valentín had already testified under oath precisely to the contrary of the proffered statement. Nor did Valentín or Serrano proffer any additional evidence corroborating his new version of events. We also share the government's concern that this sort of gambit poses a risk of abuse by facilitating efforts of defendants to secure pleas with one story while assisting a co-conspirator with another, all while avoiding telling the exculpatory story under oath. All in all, there is plenty in these circumstances to support the trial court's evidentiary ruling under Rule 804(b)(3); it was not an abuse of discretion.

**E.**

We arrive at Serrano's final contention: Even accepting all of the above, he maintains that his lengthy thirty-year sentence was substantively unreasonable. The district court calculated his United States Sentencing Guidelines range for counts 1 through 3 separately from count 4 (the discharge) because

that count carried a mandatory consecutive minimum sentence of ten years.  See 18 U.S.C. § 924(c)(1)(A)(iii), (D)(ii).  For the first three counts, Serrano's initial Guidelines sentencing range was life imprisonment (due primarily to the death), but the district court downwardly departed sua sponte for his base offense level -- from 43 to 38 -- because Serrano was unarmed and did not himself discharge a weapon.  As adjusted, the range for those three counts became 235 to 293 months, rather than life.  (Serrano concedes that the district court's Guidelines calculations were correct.) For those counts, the district court sentenced him to the low end of the downwardly adjusted range (240 months), which means that sentence is presumptively reasonable.  United States v. Calderón-Lozano, 912 F.3d 644, 648–49 (1st Cir. 2019).  As required by statute, 18 U.S.C. § 924(c)(1)(D)(ii), the court then added a consecutive sentence of 120 months for count 4, which resulted in a total sentence of 360 months.  Serrano contends that his sentence is nevertheless unreasonable for two reasons.

First, Serrano claims his sentence is not proportional to the sentences received by his co-defendants because his sentence is almost equal to Valentín's 408-month sentence and higher than Miró's 294-month sentence.  Valentín and Miró, however, each only pleaded to two of the four counts and each received credit for accepting responsibility.  In addition, Miró only pleaded guilty to the lesser-included, section 924(c)(1)(A)(i) offense of aiding

and abetting the carrying of a firearm (rather than the discharge and resulting death), which relieved him of a consecutive mandatory-minimum sentence of ten years. Thus, Serrano's proportionality plaint fails for lack of an apt comparator. See United States v. González, 981 F.3d 11, 24 (1st Cir. 2020).

Second, he maintains that the district court did not fully consider mitigating evidence and the fact that he played a minor role in the offense. This argument is equally unavailing. "[A] sentence is not substantively unreasonable simply because th[e] court 'chose not to attach to certain of the mitigating factors the significance that [the defendant] thinks they deserved.'" United States v. González-Rodríguez, 859 F.3d 134, 140 (1st Cir. 2017) (quoting United States v. Clogston, 662 F.3d 588, 593 (1st Cir. 2011)). Here, the district court already considered Serrano's role in the offense when it downwardly departed in calculating Serrano's base offense level. The court also expressly noted other mitigating circumstances, such as Serrano's "documented history of learning disabilities," the fact that this was his "first known offense," and that he did not approach any victims in the commission of the crime. Serrano on appeal, in essence, takes issue with how the court weighed these factors, but that weighing "is left largely within a sentencing court's discretion." Id. We are left, therefore, with a sentence driven by a decision not to plead guilty and a statutory minimum

consecutive sentence added onto a low-end guideline sentence determined after a downward departure.  While undoubtedly still very long, it does not exceed the boundaries of the sentencing court's wide discretion in giving within-guideline sentences. Hence, we must affirm.

## III.

For the foregoing reasons, we affirm.

The district court gave the <u>Pinkerton</u> instruction as follows:

There is another method by which you may evaluate whether to find defendant Cristian Serrano-Delgado guilty of the charge in Count TWO or Count THREE or Count FOUR of the superseding indictment.

If, in light of my instructions, you find beyond a reasonable doubt that defendant Cristian Serrano-Delgado was guilty on the conspiracy count (Count ONE), then you may also, but you are not required to, find him guilty of the crime charged in Count TWO or Count THREE or Count FOUR, provided you find beyond a reasonable doubt each of the following elements:

<u>First</u>, that someone committed the crimes charged in Count TWO or Count THREE or Count FOUR;

<u>Second</u>, that the person you find actually committed the crimes charged in Count TWO or Count THREE or Count FOUR was a member of the conspiracy of which you found defendant Cristian Serrano-Delgado was a member;

<u>Third</u>, that this co-conspirator committed the crimes charged in Count TWO or Count THREE or Count FOUR in furtherance of the conspiracy;

<u>Fourth</u>, that defendant Cristian Serrano-Delgado was a member of this conspiracy at the time the crimes charged in Count TWO or Count THREE or Count FOUR was committed and had not withdrawn from it; and

<u>Fifth</u>, that defendant Cristian Serrano-Delgado could reasonably have foreseen that one or more of

- 28 -

his co-conspirators might commit one or more of the crimes charged in Count TWO or Count THREE or Count FOUR.

If you find all five of these elements to exist beyond a reasonable doubt, then you may find defendant Cristian Serrano Delgado guilty of the crimes charged in Count TWO or Count THREE or Count FOUR, even though he did not personally participate in the acts constituting the crimes charged in Count TWO or Count THREE or Count FOUR, or did not have actual knowledge of them.

If, however, you are not satisfied as to the existence of any one of these five elements, then you may not find defendant Cristian Serrano-Delgado guilty of the crimes charged in Count TWO or Count THREE or Count FOUR, unless the government proves beyond a reasonable doubt that he personally committed one of the substantive crimes charged in Count TWO or Count THREE or Count FOUR or aided and abetted their commission.