# United States Court of Appeals

## For the First Circuit

No. 03-2138

UNITED STATES OF AMERICA,

Appellee,

v.

PATRICK V.,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. George S. Singal, U.S. District Judge]

Before

Howard, Circuit Judge,
Coffin and Campbell, Senior Circuit Judges.

Robert E. Mongue for appellant.
F. Mark Terison, Senior Litigation Counsel, with whom Paula D.
Silsby, United States Attorney, was on brief for appellee.

February 19, 2004

**COFFIN**, <u>**Senior Circuit Judge**</u>. This is an appeal by a juvenile, Patrick V. (Patrick), from a judgment of delinquency in a proceeding under the Federal Juvenile Delinquency Act (FJDA), 18 U.S.C. §§ 5031-5042, for commission of arson causing extensive property damage in violation of 18 U.S.C. §§ 844(i) and 2. The district court ordered Patrick detained for a period of 30 months, followed by supervised release for 27 months, plus joint liability with another individual for restitution in the amount of $728,141.61. Patrick claims that the rehabilitative purpose of the FJDA requires treatment rather than detention, and weighs against the imposition of restitution.

The challenge to both the detention and the restitution aspects of the judgment reflect the uneasy tension between the rehabilitation focus of the FJDA and the sterner approach of the more recent Mandatory Victim Restitution Act, 18 U.S.C. § 3663A. Federal intervention in juvenile proceedings is relatively rare, at least in this circuit, and we find ourselves in a field as yet unploughed.

After careful review, we conclude that the district court did not abuse its discretion in ordering detention and restitution on the record before it. We do, however, feel that the record is insufficient to permit the court, in arriving at its own final disposition, to factor in information as to the location and rehabilitative capabilities of the detention facility chosen by the

government pursuant to the requirements of 18 U.S.C. § 5039. We believe such consideration should be part of the juvenile sentencing process and therefore retain jurisdiction and remand to the district court for this limited purpose.

## I.  Factual Background

The Misconduct. Prior to the summer of 2002, Patrick had no history of delinquent activity or substance abuse. His emotional well-being, however, was affected by earlier traumatic events that rendered him potentially more susceptible to the influence of a 19-year old "adult" friend, Christopher Conley. At the disposition proceedings, both of Patrick's parents testified that their divorce in 1992, when Patrick was five, was acrimonious, and that Patrick's relationship with his parents likely suffered as a result. A second traumatic interlude occurred when Patrick, when ten years of age, was sexually abused by a camp counselor. After Patrick's mother confronted the counselor, the counselor committed suicide. Patrick was apparently in therapy as a result of this latter experience, but only intermittently.

The friendship between Patrick and Conley spurred the abrupt change in Patrick's behavior. Conley, recently released from a drug rehabilitation program in Pennsylvania, introduced Patrick to drugs and alcohol. Although Patrick had previously been an honor-roll student, his grades began to slip during the spring of 2002, his ninth grade year. Prior to the arson, Conley and

-3-

Patrick committed a series of burglaries. The first burglary was a vindictive payback; the rest allegedly were thrill-seeking escapades.

On the night of the arson, July 7, 2002, Conley and Patrick illicitly entered one of the buildings of Southern Maine Marine Services (SMMS), intending to steal a marine radio to enable them to monitor police communications. Once inside, they noticed surveillance cameras (which, unbeknownst to either, were inoperable). Conley and Patrick attempted to locate the surveillance videotape, but when this proved unsuccessful they decided to burn down the building and destroy any evidence of their crime. Searching the SMMS premises, they found explosive items such as flares and electronic equipment; they spread gasoline around the area and near an oil tank, and placed propane tanks near a metal frame repair building and at the corner of a wooden office building. After setting fire to the gasoline by lighting a marine flare, the two fled the scene.

The fire, which took over six hours to control, completely destroyed the building used for repairs and damaged the office building. The property damage was extensive, including the loss of two boats, three boat trailers, boat motors, tools, technical manuals and other marine equipment. The losses, amounting to over $725,000, were suffered by 26 individuals and insurance companies.

-4-

A month later, a box traced to appellant and Conley was recovered from a vacant building and led to their apprehension.

Initiation of Proceedings. An information charged Patrick with juvenile delinquency, alleging that he aided, abetted, and committed arson of a building used in interstate or foreign commerce in violation of 18 U.S.C. §§ 844(i) and 2. Under the Federal Juvenile Delinquency Act, 18 U.S.C. §§ 5031-5042, authority to prosecute requires certification that a precondition to federal jurisdiction exists, in this case the commission of a crime of violence and a substantial federal interest. 18 U.S.C. § 5032. The certificate in this case identified the basis of the federal interest as the crime of arson, damage to structures used in interstate commerce (boats owned by citizens of several states) and some federally owned property belonging to the Secret Service. At arraignment on July 3, 2003, appellant admitted the truth of the version of events presented by the government and, after careful inquiry by the court as to his understanding of his rights, signed a plea agreement.

Pre-Offense Conduct. Prior to the disposition hearing, additional information was given to the court in a Predisposition Report (bearing the caption "Presentence Investigation Report"). It included a summary of pre-offense conduct, which consisted of five burglary and theft charges pending in state juvenile court. Between June 5 and July 4, 2002, Patrick and Conley allegedly broke

-5-

into two homes, stealing computers and other such equipment valued at over $2,000, and into three places of business, stealing computers, equipment, and cash.

Medical Records. A second type of information before the court was in the form of medical and treatment records. A psychological evaluation by Dr. Greg Carbone, requested by appellant, reported that Patrick had from average to superior intelligence, but also was afflicted with "marked personality and developmental immaturity," post-traumatic stress, depressive disorder, and impulse control disorder. Dr. Carbone recommended an 18 to 36 month course of treatment.

A post-apprehension stay at a treatment center in Utah resulted in a diagnosis of mood disorder, parent-child relational problems related to his parents' acrimonious divorce, polysubstance abuse, and narcissistic traits. After five months, he was involuntarily discharged for failure to comply with rules, interference with the facility's computers, sexual misconduct, and assisting another resident in obtaining drugs for a suicide attempt. His primary therapist noted a "superficially pleasant and charismatic" personality but also concluded that he was "sneaky, dishonest, and without remorse."

Finally, Patrick was sent to a facility in Texas where he spent three weeks in a restricted setting. The staff reported that he met its expectations, "performed very well," and had no

instances of inappropriate behavior.  A clinical therapist reported that his "prognosis [was] fair given his prior treatment failure." The therapist recommended that Patrick be "in a secured residential facility for at least six to nine months" and then be admitted "to a less restrictive program."

Appellant's Financial Status.  The Predisposition Report stated that appellant had completed 11th grade and had no employment history or income source.[1]  But it recommended "a significant order of restitution" and also noted that if the court chose to invoke 18 U.S.C. § 3556, full restitution was made mandatory by the Mandatory Victims Restitution Act of 1996, 18 U.S.C. § 3663A, since a "crime of violence" had been committed.

The Disposition Hearing Order.  On August 4, 2003, the court held the disposition hearing.  Two victims of the fire made statements.  The owner of SMMS described his psychological and economic losses, concluding with the probable loss of the business he had built over the years.  An employee told how his life and that of his wife had been dramatically altered for the worse with the loss of his job at SMMS.  Appellant was present and expressed his deep sorrow and regret to both victims.  Appellant's mother and father also spoke, acknowledging the role their bitter divorce had played and stressing their son's need for professional treatment.

---

[1]Although the predisposition report states that Patrick completed the 11th grade, appellant's brief indicates that Patrick completed the 9th grade, which is more likely.

Government counsel urged the maximum term of detention that the law permitted for a juvenile in appellant's shoes, 57 months. Appellant's counsel, predicting that appellant would be sent either to California or to a southern state where he would be exposed to hardened criminals, urged that Patrick be given three years of probation, and required to attend a therapeutic educational program.

The court, at the end of the hearing, deliberated and stated its views. It noted that appellant's 19-year-old co-arsonist Conley had been sentenced to a federal penitentiary for approximately five years. It stated that it took account of Patrick's age and difficulties encountered, including the contributory role of his parents, and expressed the hope that appellant "will move on and reclaim your life." It also recognized that apologies to the two victims showed that appellant was "at least on the road to assuming responsibility." But it concluded that "accepting responsibility for what you did requires some detention in addition to probation."

The district court ordered appellant detained for 30 months, with subsequent supervised release for 27 months. It further imposed, as it felt required to do by law, an obligation to pay full restitution, jointly with his co-arsonist.

Subsequent proceedings. On October 10, 2003, the court amended the judgment to correct a "clerical mistake." Instead of

ordering payment of restitution "[i]n full immediately," it stated simply that restitution would begin following release from detention, according to a schedule devised by the supervising officer, "subject always to review" by the court. And instead of requiring interest on the restitution amount, interest was specifically waived because of Patrick's inability to pay.

On October 13, appellant moved for a statement of conclusions of law as to restitution, arguing against its imposition. The court wrote an endorsement on the motion, denying it and saying, "[r]estitution is appropriate in this case and would be ordered even if it were discretionary."

## II. Discussion

### A. Standard of Review

Both parties have given us their first preferences for a standard of review. Appellant has made a brief plea for de novo review. The government boldly suggests that review should not be available at all. We reject both invitations in favor of abuse of discretion. We are persuaded that the task of reconciling the various considerations involved in the disposition of a juvenile adjudged delinquent following commission of a very serious and dangerous crime of violence is one that demands a wide range of discretion by the sentencing court. See United States v. Juvenile, 347 F.3d 778, 784 (9th Cir. 2003)(holding that standard of review for a juvenile delinquency sentence is abuse of discretion).

## B.  <u>Restitution</u>

The government contends that because appellant ostensibly agreed to restitution in the disposition below, any claim on appeal as to the inappropriateness of restitution was forfeited.  The government points to appellant's counsel's focus on the calculation of restitution and his argument that it should be based on fair market value rather than replacement costs.  When the court inquired whether there were objections other than to the amount of restitution, it received an admittedly vague answer from appellant's counsel: "In my objections to the presentence report it was more in the nature of asking for additions; there is a lot more than is reflected."

The government, however, overlooks the fact that appellant specifically objected to the portion of the predisposition report concerning mandatory restitution.  Morever, when the August 6, 2003, judgment issued without any such specific ruling on his objection, appellant immediately filed a post-judgment motion for Conclusions of Law with Respect to the Imposition of Restitution.  The court succinctly addressed the issue and denied the motion with an endorsement reading "Restitution is appropriate in this case and would be ordered even if it were discretionary."  While appellant's lack of emphasis on the issue at the disposition hearing does give pause, it apparently stemmed from a misunderstanding that the court had already decided

that restitution was mandatory. The additional fact that the court was presented with the issue in the post-judgment motion and ruled on the merits convinces us that this is a case where we, too, should address the argument.[2] Cf. Nat'l Assoc. of Soc. Workers v. Harwood, 69 F.3d 622, 28 (1st Cir. 1995)(deciding that appellate court could hear an issue not raised below in part because omission was inadvertent, not deliberate). We also see no prejudice to the government. See id. at 627.

We therefore turn to the substance of appellant's argument. First, appellant asserts that restitution under the FJDA is discretionary, even if the underlying offense is a crime of violence. Second, appellant argues that the district court abused its discretion by ordering restitution in this case because it failed to properly consider Patrick's financial resources as well as the detrimental effect such a large debt will have on Patrick's prospects for rehabilitation. We first consider the statutory scheme, and then address its application to Patrick.

In 1995, in considering what was to become the Mandatory Victim Restitution Act, 18 U.S.C. § 3663A, the Senate Committee on the Judiciary, deeply concerned over the impact of violent crime

_____

[2]Furthermore, because this legal question is likely to arise in other cases - all the more likely because of the paucity of case law regarding federal juvenile dispositions in general and restitution in particular - declining to hear the issue will neither promote judicial economy nor aid in the administration of the juvenile justice system. See United States v. Krynicki, 689 F.2d 289, 292 (1st Cir. 1982).

-11-

upon victims, took testimony from the federal judiciary concerning the impact of the proposed legislation on the criminal justice system. Despite testimony from the Criminal Law Committee of the Judicial Conference that mandatory victim restitution would not lead to "any appreciable increase in compensation to victims of crime," the Committee was of the view that even "nominal restitution payments" serve "the potential penalogical [sic] benefits of requiring the offender to be accountable . . . ." S. Rep. 104-179, at 18 (1995), reprinted in 1996 U.S.C.C.A.N. 924,931.

The legal atmosphere of the federal act relating to juveniles is marked by a duality of objectives -- that of rehabilitation and that of protecting society. See infra at 16. This is specifically true of the impact of the Mandatory Victim Restitution Act on juveniles who have committed serious crimes inflicting losses on victims. But, despite the nominal requirement of full restitution, the reach of the Act in the case of juveniles is modest.

It is first of all necessary to identify the series of steps that lead to a juvenile restitution order. Misunderstanding of the discretionary nature of restitution, even when a crime of violence has been committed, is revealed by the brief holding in United States v. Juvenile G.Z., 144 F.3d 1148, 1149 (8th Cir. 1998), that when a juvenile pleads guilty to a crime of violence, "in these circumstances, restitution is mandatory, not

-12-

discretionary."  In fact, however, there are two stages.  There is a threshold choice, followed by a mandatory course.

This is the sequence of steps.  Under the relevant juvenile proceeding section, 18 U.S.C. § 5037, the district court "may" order restitution under 18 U.S.C. § 3556.[3]  Once the court chooses this route, § 3556 leaves no further choice, stating that the court "shall order restitution in accordance with section 3663A."  Under § 3663A, a court must order a defendant to make restitution to the victim, "[n]otwithstanding any other provisions of law," if the offense falls within the definition of a "crime of violence" under 18 U.S.C. § 16.  See 18 U.S.C. § 3663A(c)(1)(A)(i). Section 16 describes such a crime as involving the "use of physical force against the . . . property of another" or "any other. . . felony . . . that, by its nature, involves a substantial risk that physical force against the . . . property of another may be used." 18 U.S.C. § 16(1), (2).  Arson is such a crime.  And, under § 3664(b)(1)(A), restitution must be ordered in the full amount without consideration of the economic circumstances of the defendant.

This, then, is the applicable law. But its impact on the appellant is not as draconian as it might appear without taking

---

[3]Because the 2002 Amendments to the FJDA did not go into effect until November 2, 2002, they do not apply in this case.  We note, however, that this does not change our analysis of 18 U.S.C. § 5037.  Both the current and previous language of § 5037 state that the court "may" order restitution.

careful note of the court's order in this case. We have noted its deletion, in an amended judgment, of any requirement of immediate payment in full and the waiver of both fine and interest. The determination of amounts payable, the times of payment, and the duration of the payment period are described as follows:

> Any amount that the defendant is unable to pay now shall be paid in monthly installments, to be initially determined in amount by the supervising officer. Said payments are to be made during the period of his/her supervised release/probation subject always to review by the sentencing judge on request, by either the defendant or the government.

The critical time for evaluating appellant's ability to pay is, then, when the supervising officer prepares a schedule at the beginning of the period of supervised release. See United States v. Stoecker, 215 F.3d 788, 792 (7th Cir. 2000). The schedule could allow nominal payments if economic circumstances justified them, § 3664(b)(3)(B), but more substantial or even full payment could be required if, for example, appellant were to receive an inheritance.

With respect to the burdensome nature of such a large amount of restitution, appellant's premises are inflated. In his main brief he presents his predicament as that of one who "will enter adulthood with a debt unpayable," which for his whole life will "doom all hope of rehabilitation." In his reply brief he expands on the theme to assume that even a yearly payment of $14,000, over half the median income of a person in appellant's

-14-

shoes, would never pay off the debt -- something he would "carry to [his] grave."

Were this predicament a reality, a court might well say that such a burden ruled out any vestige of rehabilitation. But this is far from the reality faced by the appellant. As the government acknowledged at oral argument, and as indicated by the restitution order, the duration of appellant's payment period is the 27 months of supervised release following detention.

Given the arguably minimal impact of the order (stemming from its limited duration) in combination with the required evaluation of appellant's financial circumstances at the beginning of supervised release, we do not find that the imposition of discretionary restitution "doom[s] all hope" of rehabilitation. We therefore find no abuse of discretion.

## C. **Detention**

The thrust of appellant's argument is that the purpose of the FJDA is rehabilitation and that this purpose trumps all others. When confronted by the government's "alarmist" argument that under appellant's view a court could never impose detention on a juvenile, appellant responds that detention must be reserved for only those for whom "rehabilitation is not an option." But in such a case the court would transfer the juvenile case for trial as an adult. See 18 U.S.C. § 3502.

The absolutist view, while remaining the goal of choice for many, does not reflect the extent to which rehabilitation, with the growth of youth violence, has increasingly shared the stage with goals of the criminal process.  Stacey Sabo, Note, "Rights of Passage:  An Analysis of Waiver of Juvenile Court Jurisdiction," 64 Fordham L. Rev. 2425, 2434-435 (1996); Barry C. Feld, "The Transformation of the Juvenile Court," 75 Minn. L. Rev. 691, 692 (1991).  In United States v. R.L.C, 503 U.S. 291, (1992), Justice Souter, writing for the Court in a case involving both the FJDA and the Sentencing Reform Act, stated, "We do not think a broader congressional purpose points clearly in either party's direction." He would go no farther than to say that rehabilitation was not rejected.  Id. at 298 n.2 ("While it is true that some rehabilitative tools were removed from the juvenile penalty scheme in 1984, the Juvenile Delinquency Act does not completely reject rehabilitative objectives.")(internal citations omitted).

Absent, therefore, an absolute bar to detention, we are left to determine if the record permitted the district court's decision.  Appellant makes an impassioned argument that the only evidence before the court was that the offense took place during the brief period when he was under the sway of an adult, that he took responsibility for his actions, had no prior convictions, was markedly immature, was "already in the process of rehabilitation in

a secured, locked facility," and that there was no evidence that federal detention could provide any rehabilitation program.

This is a view of the evidence highly favorable to appellant. But the evidence before the court permitted another view. Taking responsibility for one's actions is a multi-layered concept, beginning with words and extending to conduct. The Utah therapist, after a five-month course of treatment, concluded that appellant was "without remorse." Although it was true that appellant had no prior convictions, he had five recent burglaries pending in the state court. And while appellant may well have been under the sway of his adult companion, there was the real possibility that his diagnosed craving for approval might lead him along similar paths in the future. Finally, the problematic reports covering the substantial period of time that preceded his brief stay at the Texas facility might have weighed more heavily with the court than the Texas reports of good behavior and only a "fair" prognosis.

It remains for us to note the consideration given by the district court to the relationship between rehabilitation and detention. Appellant argues that the district court gave no evident consideration to appellant's rehabilitation possibilities, in contravention of the objectives of the FJDA. At the conclusion of the disposition hearing, the court addressed appellant, giving credit for at least starting "on the road to assuming

responsibility," and acknowledging the difficulties he had encountered, the fact that he was making progress, and the case his attorney had made for probation. In the end, however, the court felt that real acceptance of responsibility entailed some detention, and ordered a term of 30 months, approximately one half the time urged by the government. This period, we note, fell within the 18- to 36-month period of treatment recommended by Dr. Carbone.

We cannot conclude on this record that there was a failure to consider any important factor, an erratic weighing, or an impermissible view of the law. At oral argument, appellant cited United States v. Juvenile, 347 F.3d at 778, as being impressive precedent for his case. Like many federal juvenile cases, that case involved a Native American in a tribal setting. A 14-year old juvenile had been beset for over half his life by sexual abuse on a grand scale and finally was himself prosecuted for sexual abuse. He signed a plea agreement, and, notwithstanding a government recommendation that he be in custody only until his eighteenth birthday, was sentenced by the court to custody until he reached twenty-one - a detention of almost seven years. The Court of Appeals reversed and remanded for resentencing.

This is a good case for appellant in its valiant assertion that rehabilitation is still alive. But the facts are distinguishable in a significant respect. As a preliminary matter,

we observe that Juvenile is not authority against all detention for juveniles found to be delinquent.  More importantly, in Juvenile, the court, rejecting the government's more moderate recommendation, ordered a maximum detention to age 21, a detention of a 14-year old of almost seven years.  By contrast, appellant's two-and-one-half year detention will end before his eighteenth birthday.

In sum, in light of the evidence before the court on appellant's progress, we cannot say that the court abused its discretion  on the present record in concluding that a 30-month term of detention is consistent with the rehabilitative objection of the FJDA.  We leave it to the district court to consider its judgment in light of information to be obtained concerning the location and nature of the detention facility to which Patrick was assigned.

The Proper Facility.  A juvenile who is detained under the FJDA is committed by the district court to the custody of the Attorney General for placement in an appropriate facility.  See 18 U.S.C. § 5039.  Pursuant to the statute, the facility must provide the juvenile not only the necessities of life, but "counseling, education, training, and medical care including necessary psychiatric, psychological, or other care and treatment."  Id.  Additionally, "[w]henever possible, the Attorney General shall commit a juvenile to a foster home or community-based facility located in or near his home community."  Id.

At the disposition hearing, appellant's counsel raised the issue of appropriateness of the facility of detention. He speculated that Patrick might be sent to California or another distant place where he would be exposed to hardened criminals. Counsel noted that, "the reality is that the Bureau of Prisons does not have a juvenile facility that will address Patrick's needs." This was in the context of appellant's effort to stress the goal of rehabilitation, and his requested disposition of probation coupled with the continued treatment he was receiving in the Texas program.

Appellant's ability to focus on the details of the detention was limited, however, because it was undetermined where he would serve his detention. At the conclusion of the proceeding, Patrick's attorney (in response to a question about self-reporting) answered, "I'm at a loss because I'm not sure where he will be designated. Supposedly it will be in his own state or community program."

The record before the district court is bereft of any information concerning the facility chosen for appellant's detention - its location, policies, and programs available to juveniles in appellant's situation. On appeal, we have been provided only with the brief statements of counsel. Appellant states in his reply brief that the regional office of the Bureau of Prisons, having neither a facility in the northeast serving only juveniles nor any contract with the State of Maine, has placed

appellant in a state facility in Pennsylvania. At oral argument, the government's attorney confirmed that Patrick is in a Pennsylvania facility and added, "that's the nearest juvenile facility to Maine."

As for the nature of the detention facility, appellant asserts only that a juvenile's communications with family are severely limited and that there is little or no evidence in the record that appropriate rehabilitative treatment is available. At oral argument, the government's attorney responded to a question concerning the availability of psychiatric treatment at the Pennsylvania facility by stating simply that he could not "imagine that the Bureau of Prisons would be staffing a juvenile facility without some professionals at that level."

We are uncomfortable with this state of the record, particularly in a case of first impression in this circuit in which federal jurisdiction is asserted under the FJDA. Our task is to try to strike a balance between the responsibilities of a court arriving at the disposition of a juvenile matter and the exclusive authority of the Attorney General to determine the facility of detention in any case.[4]

---

[4]A court's power to pass upon the adequacy of the care actually given by a facility would generally have to await a proceeding challenging custody in light of specific conditions of detention alleged by the juvenile to be deficient.

Our focus, therefore, is solely on assuring an informed sentencing decision by the court. Sentencing in a juvenile matter is in some important respects different from the more restrictive situation in adult sentencing. Section 1B1.12 of the sentencing guidelines states explicitly that "[the] guidelines do not apply to a defendant sentenced under the Federal Juvenile Delinquency Act." A district judge has wide discretion in determining whether any or how much detention (not to exceed a maximum applicable to a "similarly situated adult defendant") should be imposed on a juvenile. A rational exercise of that decision requires at the minimum a realistic understanding of the location and nature of probable detention facilities available to the government.

Accordingly, the district court should assemble from the parties information as to the likely facility and programs to which the juvenile would be sent if detention is imposed. This would not mean that the Attorney General's hands would be tied then or in the future, but it would help ensure that the court has adequate information to fulfill Congress's mandate that the FJDA preserve a balance between rehabilitation and protection goals. Such information might reveal a likely choice of facility allowing ease of family access and adequate treatment for diagnosed disorders. This would seem more in keeping with the rehabilitative goal than one with little likelihood of family access and treatment. In such event, a clearly imperfect fit might be mitigated by a shorter

commitment to detention.  Cf. Juvenile, 347 F.3d at 789, 792 (remanding to the district court for further findings of fact regarding placement of juvenile in a detention facility far from family).

Without some sort of pre-confinement review of a facility's ability to provide appropriate rehabilitation, a juvenile - whose term of detention is likely to be limited by the imminence of adulthood - may be deprived of much of the protection afforded him by the FJDA; after-the-fact review of a facility's resources could result in the juvenile spending a substantial portion of his detention in an inappropriate setting.

We therefore remand this case to the district court to complete the record as to the location of the facility of detention, its policies, programs, and resources.[5]  The court shall have broad discretion as to the nature of the proceeding.  An evidentiary hearing may be held, but the court may choose to obtain the needed information in some other fashion and may request such additional briefing as it deems necessary.  The focus of any proceeding is not the current care and custody of the appellant, but on the appropriateness of the detention facility as of the time

---

[5]In this instance, the district court will focus on the actual facility where Patrick is placed.  In other juvenile dispositions, however, we recognize that the precise placement is not necessarily ascertainable in advance, and thus the court's inquiry may focus on the realm of probable facilities.  This is further in keeping with our recognition that placement is ultimately the responsibility of the Attorney General.

of the court's disposition hearing.  Upon receipt of further information, the district court may choose to affirm or modify the original disposition.  We shall retain jurisdiction pending receipt of a report from the court.