# United States Court of Appeals
## For the First Circuit

No. 21-1700

UNITED STATES OF AMERICA,

Appellee,

v.

A.R.,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Francisco A. Besosa, U.S. District Judge]

Before

Gelpí, Lynch, and Montecalvo,
Circuit Judges.

Joanna E. LeRoy, Assistant Federal Public Defender, with whom Eric Alexander Vos, Federal Public Defender, Franco L. Pérez-Redondo, Assistant Federal Public Defender, Supervisor, Appeals Section, and Alejandra Bird-López, Research and Writing Specialist, were on brief, for appellant.
Gregory B. Conner, Assistant United States Attorney, with whom W. Stephen Muldrow, United States Attorney, and Mariana E. Bauzá-Almonte, Assistant United States Attorney, Chief, Appellate Division, were on brief, for appellee.

September 14, 2023

**GELPÍ**, **Circuit Judge**.  A.R., born in 2003, was adjudicated delinquent in a proceeding under the Federal Juvenile Delinquency Act ("FJDA"), 18 U.S.C. §§ 5031-5042, pursuant to his admission of aiding and abetting an attempted robbery of a motor vehicle (Count One) and five carjackings (Counts Two through Six), all of which would have been a violation of 18 U.S.C. § 2119(1) and (2) had he been an adult.  The district court ordered A.R. detained in a juvenile institution until he reaches twenty-one years of age, followed by a term of juvenile delinquent supervision.

A.R. primarily challenges the district court's order of a detention period rather than a probationary one.  Specifically, A.R. posits that the district court erred in:  (1) making an incorrect -- but unobjected to -- comment at the admission hearing that a substantial assistance motion from the government would be necessary in order to consider A.R.'s cooperation; (2) ordering a Presentence Report ("PSR"), as requested by his trial counsel, instead of a "comprehensive study" as provided for in the FJDA, see 18 U.S.C. § 5037(e); and (3) considering and improperly weighing the 18 U.S.C. § 3553(a) factors in its disposition.  Additionally, A.R. claims that the district court erred in failing to recommend that A.R. be placed in a local detention facility.  Separately, the government and A.R. agree that the district court

erred in imposing a term of detention and supervision that together exceeded the applicable statutory maximum.

After careful review, we affirm the district court as to its imposition of detention rather than a probationary period. However, we remand to the district court the last two matters.

## I. Background

### Relevant Facts

The events giving rise to this case date back to late 2019 and early 2020, when A.R. had not yet reached his eighteenth birthday and he committed a sequence of carjackings alongside another then-minor ("L.R.") and an adult, Erick De Jesús-Torres ("De Jesús").

### December 20, 2019: The First Carjacking

On the night of December 20, 2019, L.R. requested an Uber ride for the trio from the Manuel A. Pérez public housing project in San Juan to Carolina, two cities in Puerto Rico. The Uber driver arrived in a blue Toyota C-HR. A.R. and L.R. sat in the back, while De Jesús sat in the passenger seat. Once at their destination, De Jesús stopped the Uber car's engine as L.R. exited the vehicle and, holding a weapon, opened the driver's door and told him to get out of the car. The Uber driver complied, and the trio, after searching his pockets, drove the Toyota C-HR back to the Manuel A. Pérez public housing project. Later that night, the three went for a ride in the stolen vehicle and were involved in

an accident.  They fled the scene afoot.

### December 23, 2019: The Second Carjacking

Three days after the first carjacking, L.R. requested an Uber ride for the same trio from the Ernesto Ramos Antonini public housing project in San Juan.  The Uber driver arrived in a white Hyundai Accent and took them to some location, which from the record cannot be adduced.  Once there, De Jesús stopped the vehicle's engine while L.R. took the driver out of the car, searched the driver, seized from her $350 in cash, and left her there, with A.R. driving the trio to the Manuel A. Pérez public housing project in the Hyundai Accent.  L.R. and De Jesús then went out for a ride in the carjacked vehicle while A.R. remained at L.R.'s apartment.

### December 31, 2019: The Third Carjacking

New Year's Eve did not stop the trio from further wrongdoing.  Again at the Manuel A. Pérez public housing project, L.R. requested an Uber ride.  A driver in a red Hyundai Elantra picked them up and took them to their specified location.  Upon arrival, De Jesús stopped the vehicle's engine, exited, and walked around the car.  He opened the driver's door and told the driver to get out.  The victim reported that the trio gestured as though they had a weapon, but he did not actually see it.  L.R. searched the driver and got into his seat.  The three carjackers then drove back to the housing project, leaving the driver behind.

- 4 -

Night of January 2-3, 2020: Attempted Carjacking and Two New Successful Carjackings

At approximately 10:40 p.m. on January 2, 2020, A.R., L.R., and De Jesús requested an Uber ride from a location near the Plaza Escorial Mall in Carolina. A female driver picked them up in her blue Kia Soul and drove them to their drop-off location. Upon arrival, De Jesús stopped the vehicle's engine while L.R. held what appeared to be a firearm to the driver's neck. Defiantly, the driver refused to exit the car. L.R. unbuckled the driver's seatbelt, while De Jesús took her cellphone and ordered her to unlock it. The driver told them that they could shoot her but she was not going to let go of her car. Right after, L.R. struck the driver in the face and ordered her not to look at him. A struggle ensued as she grabbed the steering wheel while both A.R. and L.R. again struck her several times in an attempt to remove her from the vehicle. The driver started honking the vehicle's horn repeatedly, and the trio eventually fled on foot towards a nearby bowling alley with $120 in cash taken from the driver and her cellphone.

At the bowling alley, a friend of L.R. called them an Uber ride. An Uber driver arrived in a white Hyundai Accent and drove them to their specified location (undisclosed in the record). When they arrived, De Jesús stopped the car's engine, while L.R. stepped out, took the driver out of the car, searched him, and

returned to the back seat.  A.R. moved to the driver's seat, drove to Plaza Carolina Mall, and parked the carjacked vehicle near a restaurant.

From there, L.R. requested another Uber ride for the group.  This time a black Toyota Yaris picked them up.  At some point during the trip, L.R. ordered the Uber driver to make a U-turn.  The driver complied.  Immediately, L.R. told the driver to get out of the car while pointing a pellet gun at the driver's head.  The driver exited his vehicle.  After frisking the Uber driver, L.R. sat in the back seat and A.R. again drove the trio back to Plaza Carolina Mall.

The Arrest

Meanwhile, around midnight on January 3, 2020, the Uber driver of the blue Kia Soul utilized the "Find my iPhone" application, which showed her that her stolen cellphone was located in the Plaza Carolina Mall parking lot.  At approximately 12:30 a.m., she went to the mall with a friend who was a Carolina Municipal Police Officer ("CMPO").  Upon their arrival, the driver spotted A.R., L.R., and De Jesús, who had just dropped off the stolen black Toyota Yaris and were then standing outside a restaurant.  The driver identified them as the subjects who attempted to carjack her hours earlier.  The CMPO announced himself as a police officer and issued commands to the trio, which were not obeyed.  L.R. pointed a pistol at the CMPO, got in one of the

- 6 -

stolen cars, and drove off. A.R. and De Jesús fled on foot. The CMPO chased them, intercepted De Jesús, and attempted to arrest him. A struggle ensued, in which De Jesús grabbed the CMPO's firearm, firing a round that struck De Jesús in the torso. The CMPO was also injured in the struggle. De Jesús and A.R. fled, and the CMPO pursued them in his vehicle. Both were ultimately arrested.[1]

Later on January 3, FBI Task Force Agents interviewed both A.R. -- in the presence of his mother -- and De Jesús. A.R. admitted to attempting to carjack the Uber driver of the blue Kia Soul using a fake firearm. A.R. also admitted to committing the three carjackings on December 20, 23, and 31, 2019, and the two carjackings following the attempted carjacking of the blue Kia Soul with De Jesús and L.R.

**Legal Proceedings**

That same day, on January 3, 2020, the government filed a juvenile information[2] charging A.R. with attempted carjacking,

---

[1] The record does not indicate whether the CMPO himself arrested De Jesús and A.R., or if other police officers were involved.

[2] Although our past precedents have stated that "[f]ederal intervention in juvenile proceedings [wa]s [at one point] rare," United States v. Patrick V., 359 F.3d 3, 5 (1st Cir. 2004), "[t]he rise in serious juvenile crime, the contraction of state juvenile court jurisdiction, and the expansion of federal criminal law have all contributed to the increased prevalence of federal delinquency proceedings," Charles Doyle, Cong. Rsch. Serv., RL30822, Juvenile

which had he been an adult would have amounted to a violation of 18 U.S.C. §§ 2119(1) and (2). The government filed a certification to proceed under the FJDA by asserting a "substantial federal interest in the case . . . due to the violent nature of the crime affecting interstate commerce." See 18 U.S.C. § 5032. The government simultaneously filed a motion to transfer A.R. for prosecution as an adult. See id. After a magistrate judge ordered A.R. detained,[3] he began to cooperate with the government, which ultimately included, among other acts, testifying before a grand jury. Given A.R.'s cooperation, the government eventually declined to press its motion to transfer his case for prosecution as an adult.[4]

On April 5, 2021, the government filed a juvenile superseding information charging A.R. with the attempted carjacking (Count One) and five additional carjackings (Counts Two to Six) that he committed along with De Jesús and L.R.

---

Delinquents and Federal Criminal Law: The Federal Juvenile Delinquency Act and Related Matters 1 (2023).

[3] The FJDA permits the detention of a juvenile. See 18 U.S.C. § 5035.

[4] Under the FJDA, certain transfers to adult status for prosecution are mandatory while others are discretionary. See 18 U.S.C. § 5032.

Juvenile Proceedings Terminology

In juvenile delinquency proceedings the precise legal terminology used differs from that of adult criminal proceedings. Because we shall employ that same terminology, it is important to briefly explain the terms used in this opinion. Juveniles do not "plead guilty" to "crimes," but rather "admit" to conduct. The analogy to a change of plea hearing is called an admission hearing. Likewise, juveniles are not sentenced, but rather undergo a disposition.[5] See 18 U.S.C. § 5037. Moreover, juveniles are not found "guilty" but rather "adjudicated delinquent." And, following release from a detention disposition, they may be placed in "juvenile delinquent supervision" rather than "supervised release." Id. Notwithstanding, the terms "plea agreement" and "probation" are used just as in adult proceedings.

The Admission Hearing

On May 18, 2021, A.R. admitted to the conduct described in all six counts pursuant to a plea agreement. Under the agreement, the district court could use the Sentencing Guidelines to determine the upper limit in setting the term for which A.R. could be committed to juvenile detention. See 18 U.S.C. § 5037.

---

[5] We note, however, that even the Congressional Research Service used "sentencing" and "disposition" interchangeably when discussing the FJDA in a 2023 report. See generally Doyle, supra n.2; see also United States v. M.R.M., 513 F.3d 866 (8th Cir. 2008) (using terms interchangeably).

The plea agreement set forth maximum penalties under 18 U.S.C. § 5037(c)(1). By the time the parties entered into the plea agreement, A.R. had turned eighteen, thus his maximum penalties were to be determined pursuant to 18 U.S.C. § 5037(c)(2). Neither party contests this conclusion. Although both parties requested that the district court impose a probationary term, the agreement provided that the district court was not bound by that recommendation and had discretion to sentence him otherwise. As a supplement to the plea agreement, A.R. also entered into a cooperation agreement with the government.

During the colloquy that took place at the admission hearing the district court made two statements that are inapplicable to juvenile proceedings under the FJDA. First, the district court stated that A.R.'s admission "may deprive [A.R.] of some rights," and specifically that he would not be "able to hold public office; . . . serve on a jury; . . . possess any kind of firearm; . . . [and] may even lose [his] right to vote." A.R.'s counsel immediately corrected the district court, noting that because "this is a juvenile delinquency case, [A.R.] will not be adjudged as a felon, and those deprivation of rights will not and should not apply to him." The district court struck that portion of the colloquy. No party disputes that this statement was incorrect, and A.R. does not argue that this statement in isolation was error.

- 10 -

Second, the district court stated that it could consider A.R.'s cooperation with the government in determining his sentence "only" if the government filed a substantial assistance motion. No party corrected the district court during the admission hearing or at any point after. No party disputes that this statement was incorrect.

Following A.R.'s admission to the six counts of the juvenile superseding information, the district court ordered the Probation Office to prepare a PSR. A.R.'s counsel did not object to the directive that a PSR be prepared.

The PSR recounted the string of carjackings that led to A.R.'s detention. It further explained that pursuant to 18 U.S.C. § 5037(c)(2), a term of official detention may not extend "beyond the lesser of: (A) 5 years; or (B) the maximum of the guideline range, pursuant to 28 U.S.C. § 994, applicable to an otherwise similarly situated adult defendant unless the court finds an aggravating factor to warrant an upward departure from the otherwise applicable guideline range." Accordingly, the PSR included a guideline sentencing range ("GSR") calculation to determine the maximum detention applicable. The PSR concluded that the applicable GSR was 97 to 121 months.

Prior to the disposition hearing, A.R. filed what was titled his "sentencing memorandum." As explained supra, in juvenile proceedings, the correct terminology is "disposition

memorandum."  A.R.'s memorandum emphasized his cooperation -- which contributed to a juvenile adjudication and sentence, respectively, of L.R. and De Jesús -- and his potential for rehabilitation.  He also emphasized that, given his cooperation, the government agreed to recommend a disposition of probation.

### The Disposition Hearing

On August 17, 2021, the district court conducted A.R.'s disposition hearing.  The district court acknowledged and thanked A.R.'s counsel for the disposition memorandum.  Counsel then expressed that A.R. had shown "exceptional progress" since being detained at a Commonwealth operated facility in Villalba, Puerto Rico, where counsel stated that he had availed himself of every educational and counseling opportunity that was offered.  The district court clarified that, although A.R. was now eighteen and could be adjudicated as an adult, it was treating him as a minor given the delays in proceedings due to the COVID-19 pandemic.[6]

---

[6] We note that the district court stated -- incorrectly, in the absence of proceedings to try A.R. as an adult -- that A.R. was "now an adult and can be sentenced as an adult."  Even if a juvenile turns eighteen (and has not reached twenty-one) by the time the disposition hearing takes place, proceedings are covered by the FJDA given that the statute governs law violations "committed by a person prior to [their] eighteenth birthday."  18 U.S.C. § 5031(emphasis added).  In other words, turning eighteen does not otherwise turn the juvenile into an adult for purposes of the FJDA.  But see United States v. Soto-Beníquez, 356 F.3d 1, 23-24 (1st Cir. 2003) (holding adult could be tried for conspiracy crimes that began before his eighteenth birthday where defendant joined conspiracy as a minor but "ratified his participation after he had turned eighteen").

Both parties asked the district court to follow the plea agreement's recommendation of probation until A.R. turned twenty-one, in approximately three years.

The district court first explained that the Sentencing Guidelines do not apply to juvenile proceedings save that Section 1B1.12 of the Sentencing Guidelines and, in accord with that section, stated that "[t]he sentence imposed upon a juvenile delinquent may not exceed the maximum of the guideline range applicable to an otherwise similarly situated adult defendant." Here, the GSR for an adult similarly situated would be from 97 to 121 months.

The district court next recounted both A.R.'s personal characteristics and the modus operandi of the carjackings, acknowledging that A.R. had timely accepted responsibility, and recognized that both parties had recommended a term of probation until A.R. turned twenty-one. The district court disagreed with said recommendation, stating it fell short of reflecting the seriousness of the offense, promoting respect for the law, and protecting the public from further crimes. It further found that the recommendation failed to address the issues of deterrence and punishment:

> After evaluating the specific circumstances of this case, [A.R.'s] participation in the carjackings, the impact that those carjackings had on the victims, who could have easily

perceived that they were being threatened to death with a firearm, even though the weapon used was a pellet gun, as their vehicles, which they used to work and generate income, were stolen from them by [A.R.] and his co-defendants, and the increase of the offenses involving carjackings to Uber drivers in Puerto Rico, the [district court] finds that a sentence of juvenile detention is necessary to achieve the sentencing goals set forth in [18 U.S.C. § 3553(a)].

The district court ultimately adjudicated that A.R. be detained until he reached 21 years of age -- a term of detention the court calculated in its written judgement as forty-two months and three days -- followed by seventeen months and twenty-seven days of juvenile delinquent supervision, as indicated in the judgment. No fine was imposed.

Finally, the district court inquired of A.R.'s counsel if he had in mind any juvenile institution so as to permit the court to issue a recommendation for A.R.'s placement. Counsel replied that he would like the Bureau of Prisons ("BOP") to keep A.R. in Villalba, Puerto Rico. The district court explained that Villalba was not under a BOP contract and, therefore, it would recommend A.R. to be designated to a BOP contracted facility.

At the end of the disposition hearing, A.R.'s counsel objected to both the procedural and substantive unreasonableness of the disposition, emphasizing his view that the district court

had disregarded mitigating factors and failed to credit A.R.'s cooperation.  This timely appealed followed.

## II. Discussion

An early case in this circuit on juvenile delinquency proceedings under the FJDA is United States v. Patrick V., 359 F.3d 3, 5 (1st Cir. 2004).  Generally, juveniles apprehended and processed by federal authorities for armed robbery or carjacking are subject to proceedings for transfer to adult status pursuant to 18 U.S.C. § 5032.  See United States v. Smith, 178 F.3d 22, 26 (1st Cir. 1999), cert. denied, 528 U.S. 910 (1999).  Here, the government -- to A.R.'s benefit -- did not seek to transfer A.R. to adult status, and so we briefly describe the governing statute for juvenile delinquency proceedings, the FJDA, before discussing the merits of A.R.'s arguments.

The FJDA, 18 U.S.C. §§ 5031-5042, governs the treatment of juveniles who are charged in federal court with violating federal criminal laws.  See 18 U.S.C. § 5032.  The FJDA defines "juvenile" to be a "person who has not attained [their] eighteenth birthday, or for the purpose of proceedings and disposition . . . a person who has not attained [their] twenty-first birthday."  18 U.S.C. § 5031.  The FJDA is designed with leniency and rehabilitation in mind but the goal of rehabilitation "has increasingly shared the stage with [the other] goals of the criminal process."  Patrick V., 359 F.3d at 10; see also United

States v. R.L.C., 503 U.S. 291, 298 n.2 (1992) ("We do not think a broader congressional purpose points clearly in either party's direction" -- that is, neither toward nor away from rehabilitation as a goal).

FJDA proceedings are "marked by a duality of objectives -- that of rehabilitation and that of protecting society." Patrick V., 359 F.3d at 9. The FJDA provides for a district court to consider a juvenile's "personal traits, his capabilities, his background, any previous delinquency or criminal experience, any mental or physical defect, and any other relevant factors." 18 U.S.C. § 5037(e). This information can be gathered from what the FJDA labels a complete study. See 18 U.S.C. § 5037(e). With this in mind, we turn to the case at hand.

At his disposition hearing, A.R. objected to both the procedural and substantive reasonableness of his disposition. On appeal, however, he does not specify whether his arguments are directed to procedural and/or substantive reasonableness. Whether labeled procedural or substantive, the first set of A.R.'s challenges fail. The corresponding safeguards in adult proceedings provide that "[w]here challenges are to the procedural and substantive reasonableness of a [disposition], our review process is bifurcated: we first determine whether the [disposition] . . . is procedurally reasonable and then determine

- 16 -

whether it is substantively reasonable." United States v. Flores-Quiñones, 985 F.3d 128, 133 (1st Cir. 2021) (cleaned up).

### 1. Detention and Supervised Release Calculation

We agree with A.R. and the government that the district court erred in calculating the term of juvenile detention and subsequent supervision because it exceeds the FJDA's statutory maximum of five years pursuant to 18 U.S.C. § 5037. Accordingly, the case must be remanded for the district court to correct the miscalculations.

The relevant FJDA provision explains that:

> (d)(1) The court, in ordering a term of official detention, may include the requirement that the juvenile be placed on a term of juvenile delinquent supervision after official detention.
>
> (2) The term of juvenile delinquent supervision that may be ordered for a juvenile found to be a juvenile delinquent may not extend--
>
>> (A) in the case of a juvenile who is less than 18 years old, a term that extends beyond the date when the juvenile becomes 21 years old; or
>>
>> (B) in the case of a juvenile who is between 18 and 21 years old, a term that extends beyond the maximum term of official detention set forth in section 5037(c)(2)(A) and (B), less the term of official detention ordered.

18 U.S.C. § 5037(d)(1), (2) (emphasis added). Likewise, the statute explains that the official term of detention for a juvenile

- 17 -

who, like A.R., is between eighteen and twenty-one years old, may not exceed the lesser of five years or the maximum of the guideline range applicable to a "similarly situated adult defendant unless the court finds an aggravating factor to warrant an upward departure." 18 U.S.C. § 5037(c)(2). Here, the maximum period of detention is five years.

In its written judgment, the district court ordered a term of detention "until [A.R.] reaches 21 years of age (that is, for a term of 42 months and 3 days)" and from then, a term of juvenile delinquent supervision of "17 months and 27 days, pursuant to [18 U.S.C. § 5037(d)(2)(B)]." The district court miscalculated the total amount of time that will transpire from A.R.'s detention until he turns twenty-one. The total amount of time is not 42 months and 3 days, but rather, 49 months and 17 days. This inadvertent miscalculation thereby tainted the accuracy of the juvenile delinquent supervision term. If allowed to stand, A.R. would essentially be "sentenced" to around 67 months and 14 days (49 months and 17 days plus 17 months and 27 days), which exceeds the maximum five-year period authorized by the FJDA. Such a miscalculation simply cannot stand. We thus remand for the district court to enter an amended judgment with the correct calculations as to the juvenile detention and delinquent

supervision terms.[7]  See United States v. Procell, 31 F.4th 32, 39 (1st Cir. 2022).

### 2. Challenges to Detention

#### a. The Court's Statements About Substantial Assistance Motion

A.R. first contends that the district court, not at the disposition hearing, but at the admission hearing, incorrectly stated as part of the admission colloquy that a substantial assistance motion from the government was necessary for it to consider A.R.'s cooperation as a mitigating factor in its disposition.  From this statement, he makes the further argument that the district court incorrectly disregarded the "critical and significant assistance" provided to the government.  As noted supra, neither party objected to that statement or corrected the district court judge during the admission hearing or after.  Three months separated the admission hearing from the disposition hearing, and neither party argues that the district court said or did anything at the disposition hearing to suggest that it still

---

[7] A.R. asserts that "there is at least a reasonable probability that a district judge would have opted for a shorter detention period in order to maintain a robust period of [juvenile delinquent supervision] to transition [A.R.] back into a law-abiding life" and that error requires reconsidering the disposition in its entirety.  We are unpersuaded by this argument.  In its oral pronouncement, the district court was clear in its intention of placing A.R. in juvenile detention until his 21st birthday.

believed a substantial assistance motion was necessary for it to consider A.R.'s cooperation.

He further maintains that the district court should have articulated how it considered his cooperation and acknowledged the same in its disposition. While the government agrees that the district court incorrectly stated at the admission hearing that a substantial assistance motion was necessary,[8] it points out that the district court did in fact consider A.R.'s cooperation in its disposition. Moreover, the government points out that there is no indication in the record that the district court felt constrained by the lack of a substantial assistance motion in considering A.R.'s cooperation. Rather, the record evidences that the district court indeed did articulate its awareness of his cooperation and assistance in determining its disposition.

We agree that the district court's observation at the admission hearing noting that it required a substantial assistance motion from the government to consider A.R.'s cooperation was indeed incorrect. United States v. Landron-Class, 696 F.3d 62, 77 (1st Cir. 2012). But the district court soon, in effect, corrected the error and A.R. suffered no harm.

---

[8] At oral argument, the government admitted that it did not correct the district court when it indicated that the government must file a substantial assistance motion.

- 20 -

Careful examination of the record demonstrates that the district court did take A.R.'s cooperation into account. At A.R.'s disposition hearing, the district court acknowledged reading A.R.'s disposition memorandum, which painstakingly recounted A.R.'s immediate admission of responsibility and cooperation with the government (which ultimately led to the indictment and information, followed by a guilty plea and admission from his aiders and abettors, De Jesús and L.R., respectively). Likewise, the district court was well aware that the government and A.R. had jointly recommended probation instead of detention, given his cooperation. The district court also acknowledged that "[A.R.] timely accepted responsibility for his offense" and noted that this led to his offense level being reduced. Moreover, it noted that it had "evaluat[ed] the specific circumstances of this case" (the victims involved, the impact on them, that they were at the time working) when explaining its disposition.

### b. PSR Versus Comprehensive Study

A.R. on appeal asks us to disregard his position in the district court and find that the district court plainly erred in ordering a PSR instead of a comprehensive study pursuant to 18 U.S.C. § 5037(e), which pertinently provides that "[i]f the court desires more detailed information concerning an alleged or adjudicated delinquent, it may commit him . . . for observation

- 21 -

and study by an appropriate agency."[9]  At the outset, this claim was not preserved in the district court.  "Even more fatal to [A.R.'s] contention is . . . that he not only did not object: he affirmatively agreed."  United States v. Chen, 998 F.3d 1, 9 (1st Cir. 2021); see also United States v. Ruiz-Valle, 68 F.4th 741, 745-46 (1st Cir. 2023).  A.R.'s trial counsel indeed supported the preparation of a PSR:  "I know the Court wants a [PSR], and I think that that would be very helpful for everyone."  Hence, A.R. cannot now claim that the district court erred in doing what he affirmatively agreed to.  See Ruiz-Valle, 68 F.4th at 745-46; United States v. Serrano-Delgado, 29 F.4th 16, 29 (1st Cir. 2022).  Accordingly, we find that this argument has been waived.  Chen, 998 F.3d at 9.

c. Section 3553(a) Factors

A.R. next posits that the district court erred in "mak[ing] [the § 3553(a) factors] the primary focus of its [disposition]."  A.R. contends that the district court should have emphasized his rehabilitation over the seriousness of his offense, just punishment, respect for the law, and deterrence so as to stay aligned with the purpose of the FJDA.  The government maintains that A.R.'s position is waived because he advocated below for

---

[9] There is no meaningful difference between a PSR and a predisposition report (comprehensive study).  See Patrick V., 359 F.3d at 6.

- 22 -

consideration of the § 3553(a) factors, which he now challenges. We, however, construe A.R.'s claim differently from the government. A.R. is not arguing that the district court should not have considered the § 3553(a) factors, but instead that they were afforded excessive weight. Because A.R.'s counsel objected to the "excessive weight" given to the factors "already taken into account in the sentencing guidelines" (the § 3553(a) factors) at the disposition hearing, we find this statement sufficient to give notice to the district court of A.R.'s objection. See Ruiz-Valle, 68 F.4th at 746. We thus review for abuse of discretion, see United States v. Melendez-Rosado, 57 F.4th 32, 37-38 (1st Cir. 2023), and find none.

"The legal atmosphere of the [FJDA] is marked by a duality of objectives -- that of rehabilitation and that of protecting society." Patrick V., 359 F.3d at 9. In keeping with that duality of objective, Patrick V. rejected the argument, embraced by other circuits, that the district court must select the least restrictive disposition that would achieve rehabilitation. Id. at 11-12; see also United States v. M.R.M., 513 F.3d 866, 869 (8th Cir. 2008) (joining our circuit in rejecting a least-restrictive disposition requirement). Careful examination of the record indicates that the district court precisely emphasized these very objectives in its disposition. At the disposition hearing, the district court stated that the

- 23 -

recommended action by the parties -- probation -- "d[id] not reflect the seriousness of the offense, does not promote respect for the law, does not protect the public from further crimes . . . , and does not address the issues of deterrence and punishment."  These, along with rehabilitation, are factors under § 3553(a).  See 18 U.S.C. § 3553(a).

Here, as in Patrick V., "the court felt that real acceptance of responsibility entailed some detention."  359 F.3d at 11.  The district court explicitly considered the need to "protect society" when it described the specific circumstances that influenced its disposition:  A.R.'s participation in carjackings at gunpoint, including the fact that the trio pointed a pellet gun at a female victim's head, who also sustained bodily injuries during the offense; the economical and emotional impact on the victims, whose stolen property -- their cars -- were their means of working and generating income; the fact that the victims could easily have perceived they were being threatened with death; and the danger to public safety from an increased number of carjackings of rideshare drivers in Puerto Rico.  M.R.M., 513 F.3d at 869 ("Nothing in the statute precludes the district courts from giving due consideration . . . to protection of the public or deterrence.").

As discussed supra, the district court was well aware of A.R.'s cooperation and his acceptance of responsibility.  The

district court further considered and prioritized rehabilitation by recommending that A.R. participate in a job placement program, vocational training, GED courses, and mental health treatment, if necessary while detained. Indeed, "rehabilitation, with the growth of youth violence, has increasingly shared the stage with the goals of the criminal process." Patrick V., 359 F.3d at 10. Thus, after analyzing and evaluating all that was before it, the district court felt that "real acceptance of responsibility entailed some detention." Id. at 11. All this cuts against A.R.'s argument that the district court placed improper weight on § 3553(a) factors. We thus conclude that the district court did not commit procedural error.

For the same reasons, A.R.'s argument that the term of juvenile detention was substantively unreasonable lacks merit. We review for abuse of discretion. Flores-Quiñones, 985 F.3d at 133. Here, the totality of the record supports a finding that a period of juvenile detention followed by a term of juvenile delinquent supervision was warranted given the circumstances of the case and the need to both rehabilitate and protect society. See Patrick V., 359 F.3d at 11-12; United States v. A.S., 939 F.3d 1063, 1085 (10th Cir. 2019). A judge adjudicating a juvenile disposition "should set forth enough to satisfy the appellate court that [they have] considered the parties' arguments and has a reasoned basis

for exercising [their] own legal decision[-]making authority." Rita v. United States, 551 U.S. 338, 356 (2007).

As discussed supra, the totality of the record is clear as to the district court's examination of A.R.'s cooperation. Cf. United States v. Muñoz-Fontanez, 61 F.4th 212, 214-15 (1st Cir. 2023). "There is not the slightest reason to think that the district court overlooked [A.R.'s cooperation]." United States v. Cortés-Medina, 819 F.3d 566, 571 (1st Cir. 2016). In the end, however, the district court understood A.R.'s conduct necessitated detention rather than probation. Thus, we discern no abuse of discretion in the district court's failure to explicitly acknowledge mitigation. See Patrick V., 359 F.3d at 8. ("[T]he task of reconciling the various considerations involved in the disposition of a juvenile . . . is one that demands a wide range of discretion[.]"). We thus find no abuse of discretion.

3. Concerns About A.R.'s Juvenile Facility Placement 2,000 Miles From His Family

A.R. next challenges the district court's failure to recommend Villalba -- a state juvenile facility where A.R. had been detained pending his disposition -- as the local juvenile institution for his post-disposition detention.

The FJDA provides for special rules for juveniles. That is, pursuant to an adjudication of delinquency, a juvenile shall

be committed under the custody of the Attorney General,[10] who shall place the juvenile in an appropriate facility. See 18 U.S.C. § 5039. Such a "facility must provide the juvenile not only the necessities of life, but 'counseling, education, training, and medical care . . . or other care and treatment.'" Patrick V., 359 F.3d at 12 (quoting 18 U.S.C. § 5039). Further, "[w]henever possible, the Attorney General shall commit a juvenile to a . . . facility located in or near his home community." 18 U.S.C. § 5039.

Here, the exchange between the district court and A.R.'s counsel on the location of his detention post-conviction was brief. The district court asked his counsel if there was any juvenile institution that counsel would like the district court to recommend. In reply, counsel requested placement at the Puerto Rican facility Villalba, stating earlier that "[A.R.] has made exceptional progress since being at Villalba for the past . . . year and a half [a]nd . . . has availed himself to every opportunity, be it educational, counseling, opportunities to work closely with a social worker."

---

[10] Here, the district court committed A.R. to the custody of the Bureau of Prisons. A.R. argues that it was error for the district court to commit him to that agency's custody rather than the custody of the Attorney General directly, as named in the statute. Because the Bureau of Prisons is housed within the Department of Justice, however, A.R. was in fact committed to the Attorney General's custody when he was committed to the Bureau of Prisons.

The district judge responded: "I don't know if [BOP] can do that. It's got to be one that is under [BOP's] contract, and I don't think Villalba is, so I will recommend that [A.R.] be designated to a juvenile institution under contract with the [BOP]." Counsel did not disagree. Indeed, it appears the district court was correct.

At the outset, we note that A.R. has not cited, nor have we identified, any statute that requires a federal juvenile court to recommend a detention facility when committing a juvenile delinquent to the custody of the Attorney General for a term of official detention. In fact, the provision of federal criminal law which authorizes the BOP to consider a sentencing court's recommendation as to placement in the adult context, 18 U.S.C. § 3621, is not incorporated into the FJDA despite the fact that the FJDA explicitly incorporates other provisions of federal criminal law. See, e.g., 18 U.S.C. § 5037(c) (incorporating 18 U.S.C. § 3624). For that reason, we believe a court imposing a term of official detention on a juvenile delinquent may, in its discretion, but is not required to, issue a recommendation as to facility placement.

Our decision in Patrick V. noted the tension between a potential recommendation from the court and the commitment of the juvenile to the custody of the Attorney General given "our recognition that placement is ultimately the responsibility of the

Attorney General." 359 F.3d at 13 n.5. Patrick V. involved a juvenile who was also ordered detained pursuant to the FJDA after a finding that he committed arson causing extensive property damage. As such, he was to be placed in juvenile detention for thirty months, followed by juvenile delinquent supervision for twenty-seven months. Id. at 7. Like the facts before us today, Patrick V.'s disposition hearing was "bereft of any information concerning the facility chosen for [his] detention -- its location, policies, and programs available to juveniles in [his] situation." Id. at 12. While at his disposition hearing, Patrick V.'s counsel inquired about the appropriateness of the detention facility where Patrick V. might be sent, speculating that he might be sent somewhere far where he would not receive rehabilitation, there appeared to be no further discussion on the subject. Id. At oral argument on his appeal, we learned that Patrick V. was ultimately sent to a state facility in Pennsylvania, 550 miles from Patrick V.'s home in Maine. See id.

Ultimately, we found ourselves "uncomfortable with [the] state of the record," noting that "[o]ur task is to try to strike a balance between the responsibilities of a court arriving at the disposition of a juvenile matter and the exclusive authority of the Attorney General to determine the facility of detention in any case." Patrick V., 359 F.3d at 13. As such, we held that because "[a] district judge has wide discretion in determining whether any

or how much detention . . . should be imposed on a juvenile[,] [a] rational exercise of that decision requires at the minimum a realistic understanding of the location and nature of probable detention facilities available to the government." Id. The record being bereft of these details, this Court remanded the case to the district court after concluding that neither we nor the district court had sufficient information about where Patrick V. would serve his juvenile detention, and the nature of the services such facility offered -- facts which we thought were relevant to the district court's disposition. See id. at 12-14.

Here, we are troubled by the fact of Puerto Rico's island status and location in the Atlantic Ocean, approximately 1,000 miles from the nearest point in the U.S. mainland, that being the state of Florida. Hence, A.R.'s detention, unlike that of Patrick V., poses additional challenges insofar as proximity to his home community, which is a matter for the Attorney General to consider. At oral argument A.R.'s counsel stated that A.R., who does not speak English, is currently being housed at a juvenile detention facility in Texas, which we note is approximately 2,000 miles from Puerto Rico.[11] We think it appropriate on remand for the government

---

[11] We take judicial notice that in 1994 Puerto Rico's institutionalized juvenile population -- subject to a federal consent decree -- was approximately 2,000. Over the years, it has dwindled and, as of March 2023, was 62. See Fed. Monitor's First Q. Rep. for 2023 at 25-26, United States v. Commonwealth of Puerto Rico, (No. 94-2080), ECF No. 1938.

to provide more information as to the options available for his detention, to permit the district court to make a recommendation. We do not understand the government to argue that, on remand, the court lacks discretion in this area.

### III. Conclusion

A.R.'s disposition is both procedurally and substantively reasonable. For the foregoing reasons, the district court's disposition is **AFFIRMED**. We **REMAND** to the district court to correct the term of juvenile detention and subsequent delinquent supervision, to hear from the government as to A.R.'s placement, and to make a recommendation as to that placement if the district court so chooses.[12]

So ordered.[13]

---

[12] We deny A.R.'s request that the case be reassigned on remand to a new judge. See United States v. Castillo-Torres, 8 F.4th 68, 73 (1st Cir. 2021).

[13] We caution district courts and attorneys to be mindful of the terminology they use in federal juvenile delinquency proceedings, as they each must adhere to the language set forth in the FJDA, the purpose of which is "to enhance the juvenile system by removing juveniles from the ordinary criminal justice system and by providing a separate system of 'treatment' for them." United States v. Juvenile, 347 F.3d 778, 785 (9th Cir. 2003)(internal citations omitted).